IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2000

## DONNA BROWN MARTIN v. MARY LYNN COLEMAN, ET AL.

**Appeal from the Chancery Court for Humphreys County**
**No. 24-068     Allen W. Wallace, Chancellor**

---

**No. M1999-02238-COA-R3-CV - Filed June 18, 2001**

---

This is a dispute over real property which was the subject of an installment land sales contract between the parties and over the proceeds of an insurance policy after the dwelling on the property burned. The trial court ordered that the title to the property be divested from the Seller and be vested in the Buyer and that the remaining proceeds of the insurance policy be awarded to Buyer after all overdue payments of taxes and insurance and the incurred clean up costs were deducted. The Seller appeals on the grounds that the evidence was contrary to the judgment and that the plaintiff had breached the contract and is entitled to neither the property nor the insurance proceeds. For the reasons below, we affirm the judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed As Modified**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

David D. Wolfe, Dickson, Tennessee, for the appellant, Mary Lynn Coleman, et al.

J. P. Bradley, Waverly, Tennessee, for the appellee, Donna Brown Martin.

**OPINION**

This appeal involves an installment land sales contract entered into between the parties in 1988.[1] Ms. Coleman ("Seller") bought the property in question in the spring of 1988 and borrowed $11,000 from a credit union to finance the purchase. However, shortly thereafter she agreed to sell

---

[1]Originally, J. R. Coleman, Mary Lynn Coleman's husband, was made a defendant to this suit, however, plaintiff did not proceed against him at trial due to evidence and belief that he did not have an ownership interest in the property in question which was titled solely in Mrs. Coleman's name.

1

the property to Ms. Martin ("Buyer") under an installment land sales contract. The contract provides in pertinent part:

> The purchase price of said property shall be $15,500.00 (fifteen thousand five hundred dollars) and to be paid as follows:
>
> $500.00 down payment to be paid before the 1st day of August, 1988, and 120 monthly payments of $215.21 to be paid the 1st of each month, 1st payment being due August 1, 1988.
>
> After receipt of last payment SELLER agrees to convey the subject property to BUYERS by good and valid warranty deed, subject only to any restrictive covenants and easements of record, zoning ordinances or regulations affecting same.
>
> If any payment is not paid on or before the 10th of the month in which it is due, an additional 10 percent of said payment must be paid.
>
> *****
>
> BUYERS agree to purchase a fire insurance policy on said property in an amount to the satisfaction of the SELLER.
>
> *****
>
> BUYERS agree to make all necessary repairs to the property after the signing of this agreement and continue to keep the property in a good state of repair until said contract is fulfilled.
>
> The contract is non-transferrable without written consent from the SELLER.
>
> If during the existence of this agreement, BUYERS should be more than thirty (30) days late in making said monthly payment, the SELLER shall have the right to declare this agreement null and void and shall send BUYERS notice to vacate the premises within ten (10) days of such notice. In this event, the SELLER shall retain any and all sums paid by BUYERS as liquidated damages or as rental for the use of the premises during the period of occupancy by the BUYERS or his lessees.
>
> *****
>
> BUYERS shall also pay for property taxes on an annual basis for subject property.

The contract was signed by Donna Brown Martin and Mary Coleman on July 29, 1988 in front of a notary public. Buyer took possession immediately. The parties reviewed the terms of the contract and even discussed the provisions prior to the contract being signed. There is a dispute between the parties as to who drafted the contract. Buyer testified that she did not know where the contract came from and assumed that Seller had it drafted because she presented it to her for her final approval before signing. On the other hand, Seller testified that she had a friend type the contract from a copy of a similar contract which Buyer provided and had previously signed in another deal.

One of the terms discussed prior to signature was the issue of insurance. Buyer testified that she stated she was concerned that because the property was not in her name, she would not be able to obtain insurance. Therefore, Seller agreed that Buyer would simply reimburse her for the premium payments because she had to keep insurance on the property according to the mortgage lender. Seller does not directly dispute this but states, "I told her that I had to have insurance on the house because of borrowing money against it, that I had to have it for what I owed against it and that she needed to get her own insurance, renters insurance, several times." Additionally, Seller admitted to accepting reimbursement payments from Buyer for the premiums she paid on the insurance policy she held in her name. She even kept a running ledger of what the annual taxes and insurance premiums were and deducted payments made by Buyer.

The ledger does not begin until 1990 and shows that Buyer reimbursed Seller for the insurance policy premiums and the taxes periodically over time. Seller admitted that the ledger did not reflect a payment made in March of 1993 for $439 and that there were calculation errors. The principal payment under the installment note was current on the property, but Seller testified that over the early 1990's, the payments for insurance and taxes were not made in full and were late.

Buyer lived alone on the property until the early 1990's. After that time, she moved out and allowed her sisters and mother to move onto the property. However, Buyer testified that while she was not residing on the property full time, she still maintained the property with her belongings, and it was still a home place for her and her family whenever someone needed a place to live. She testified that she visited the property and considered it home. Even though she was not living there full time, she contributed to the payments and never considered the property nor the contract to be assigned or transferred to anyone else. Buyer fully expected that when all the payments were made under the contract, she would obtain title to the property. In fact, the parties discussed other people living there and Seller responded, "She mentioned her sister moving in and I said that's fine. I just need the money to make the monthly payment at the credit union."

The building located on the real property burned on October 5, 1995 and Seller collected $11,000 in insurance proceeds. The proceeds paid off the remaining debt on Seller's loan and she paid $2,500 to have the debris cleaned up from the fire.

On October 24, 1995, Seller refunded Buyer's October payment paid by money order. Shortly thereafter, Buyer demanded title to the property, and this suit ensued. After a bench trial, the judge found that Seller had applied any overpayments in rent to the taxes and insurance due and that these were current as of March 3, 1993, but not paid after that date. Therefore, at the time of the fire, there was an unpaid balance of $810 for taxes and insurance. Finally, based on the calculation that $5,899 was left owed under the sales contract and deductions for clean up and overdue taxes and insurance, the court awarded a judgment against Seller for the remaining $1,791 of the insurance proceeds to Buyer and awarded the title to the property to Buyer.

Seller appeals the judgment on the grounds that Buyer breached the contract by allowing others to live on the property, thereby attempting to assign or transfer the contract without her

3

consent, and by being delinquent in payment of property taxes and insurance as required by the terms of the contract. For the reasons herein, we affirm the trial court's judgment. However, we modify the calculation of damages.

## I.

This is an appeal from a bench trial and accordingly, our standard of review is governed by Tenn. R. App. P. 13(d). Our review of the record is *de novo* with the presumption that the findings of fact are correct "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We must also give great weight to such factual findings by the trial court that rest on determinations of credibility. *Randolph v. Randolph,* 937 S.W.2d 815, 819 (Tenn. 1996). However, no presumption of correctness attaches to the trial court's conclusions of law. Tenn. R. App. P. 13(d); *Hansel v. Hansel,* 939 S.W.2d 110, 111 (Tenn. Ct. App.1996).

## II.

Tennessee courts have addressed the rights of the parties in similar fact situations, particularly in *King v. Dunlap*, 945 S.W.2d 736 (Tenn. Ct. App. 1996), which relies heavily on and quotes extensively from *Parker v. Tennessee Farmers Mut. Ins. Co.*, No. 141, 1988 WL 138923 (Tenn. Ct. App. Dec. 30, 1988). In *King*, the sellers, the Dunlaps, entered into a contract to sell to Mr. King a lot and house for $6,500 to be paid in monthly installments including interest and an additional monthly amount to pay for insurance and taxes. Upon payment of the purchase price, the sellers would convey the property by warranty deed to Mr. King. The sellers purchased an insurance policy. Mr. King moved onto the property, made some repairs, and made mortgage payments with irregularity. Two years after the contract was signed, the building was destroyed by fire. The insurance company denied that Mr. King had any insurable interest in the property and that the extent of recovery, if any, to the Dunlaps was the balance owed them by King, not the value of the property. After a thorough examination of authorities, this court held:

> Also, as indicated by the foregoing authorities, King, upon entering into the sales agreement with Dunlaps and taking possession of the property, became the equitable owner of it. Consequently, via the doctrine of equitable conversion, the risk of loss had accrued to King at the time the fire occurred. Consequently, the proper result would be that the Dunlaps, though entitled to full recovery from Mid-Century (the insurance company), must hold those proceeds in excess of their interest, i.e., the unpaid balance of the purchase price, in trust for King.

*King*, 945 S.W.2d at 744 (citations omitted).

In a more recent case, this court has had occasion to focus on the rights between the buyer and the seller in a similar fact situation, expanding on *King*:

4

> *King* and *Parker*, as well as the cases discussed in those opinions, deal primarily with the question of whether an insurance company is required to pay the full amount of the policy or whether its obligation is limited to the seller's beneficial interest in the property, i.e., the unpaid balance of the purchase price. In the instant case, the insurance company has already paid the full amount of the policy to Seller, and the question at issue is whether the proceeds received by Seller must be applied towards the purchase price.

*Hillard v. Franklin*, 41 S.W.3d 106, 115 (Tenn. Ct. App. 2000).

In *Hillard,* the parties entered into a contract for the sale of real property for a total price of $80,000, which included a down payment of $10,000 at closing and equal monthly installments thereafter. The actual sale was not closed, but buyers took possession and had some work done on the property. The main house on the property was destroyed by fire two months after the contract was executed, and the seller recovered from her insurance company an amount that included $35,000 for the loss of the dwelling. The sale did not close, and the buyers brought suit for specific enforcement of the contract and reduction of the sales price by the $35,000 the seller had received from the insurance company. This court affirmed the trial court's judgment for the buyers on both issues, and it is the court's resolution of the second issue that is relevant to our discussion herein.

This court in *Hillard* quoted from *Parker* the general rule that:

> where the insured vendor has sold the property and vendee has gone into possession and paid a portion of the purchase price, but title is still held by the insured, as between the insured and the insurer the insured is the owner of both the legal and equitable titles to the property and entitled to recover the full amount of the policy. However, as between the vendor and the vendee, the insured takes the proceeds of insurance which exceed the amount owed to the vendor, as trustee for the vendee.

*Hillard*, 41 S.W.3d at 114 (quoting Parker, 1988 WL 138923 at *1).

Relying upon the authority cited in *King* and *Parker* as dicta as well as other authority, this court held that the proceeds collected by the seller must be applied to the purchase price in buyer's favor. *Id*. at 116. Specifically, we concluded "a seller must apply insurance proceeds to the purchase price, at least where the risk of loss falls on the purchaser. The risk of loss during the period between execution of a contract from the conveyance of real property and the closing generally falls on the purchaser." *Id*. at 115 (citations omitted).

*Hillard* dealt with a situation where no part of the purchase price had been paid and there was an executory contract to convey the property. In the case before us, Buyer had been in possession of the property and making payments on it for over seven years. Therefore, although we consider *Hillard* helpful to our analysis, its main import is its reinforcement of the principles of *King v.*

5

*Dunlap* as those principles apply to the facts before us: once the insurance proceeds have been paid, must they be applied to the purchase price.

Tennessee is one of the jurisdictions which follows the equitable rule "that where the building which was the subject of conveyance is destroyed or damaged, the vendor must apply the proceeds upon the purchase price and account for the balance to the purchaser." *Hillard*, 41 S.W.3d at 115; *King*, 945 S.W.2d at 743; *Parker*, 1988 WL 138923 at *4 (quoting 5A APPLEMAN, INSURANCE LAW AND PRACTICE, 212-15 (1970)).

In this case, the contract provided that Buyer was to maintain insurance, confirming the risk of loss would fall on her. The parties agreed, as their course of conduct shows, that Buyer would reimburse Seller for insurance premiums. Thus, the continued acceptance of the reimbursement of payment for the insurance premiums supports the trial court's conclusion that the parties agreed Seller would maintain the policy and Buyer would pay the premiums. Therefore, any proceeds from the policy were held in trust by Seller for Buyer's benefit, and may, in the first instance be applied to the remaining balance owed to Seller under the contract. Any excess belongs to Buyer, absent other obligations owed to Seller by Buyer. If the insurance proceeds pay off the balance of the loan, the Buyer is entitled to conveyance of the real property under the contract.

The trial court applied these general principles, ordering the insurance proceeds to be applied to the loan balance, ordering conveyance of the real property to Buyer, and ordering the excess insurance proceeds paid to Buyer, after deduction of other obligations or expenses the court found due to Seller.

III.

Seller acknowledges the *King v. Dunlap* case, but argues its principles should not be applied here. She contends that Buyer is not entitled to the insurance proceeds because Buyer breached the installment contract (1) by not making timely payments on the taxes, as required in the contract[2] and (2) by allowing other persons to live on the property and, in effect, assigning the contract to someone else. The consequence of these breaches, Seller argues, is that Buyer cannot avail herself of the equitable theories of unjust enrichment and equitable conversion.

---

[2]Seller asserts that the alleged oral modification of the contract regarding insurance coverage on the property, found by the court based on the parties' course of conduct, was not valid and, therefore, Buyer has no interest in the insurance proceeds. Consequently, Seller is restrained from arguing that Buyer's arrearage in reimbursement of insurance premiums was also a breach of the installment sales contract. She does, however, make the argument that if there were an oral agreement, Buyer breached it since the trial court found no reimbursement occurred after March 1993. She also argues that Buyer breached the written contract by failing to maintain insurance as the contract required. We agree with the trial court's conclusion that Buyer fulfilled this provision by agreeing with Seller for Seller to maintain the coverage she already had and Buyer would reimburse her for the premiums.

6

First, we disagree with Seller's theory that her obligation to perform under the contract was eliminated by Buyer's breach due to the late payments of taxes. The contract required Buyer to " pay for property taxes on an annual basis for subject property." While the tax and insurance payments were in arrears, the payments on the sales contract were up to date at the time of the fire. The contract provided:

> If during the existence of this agreement, BUYERS should be more than thirty (30) days late in making said monthly payment, the SELLER shall have the right to declare this agreement null and void and shall send BUYERS notice to vacate the premises within ten (10) days of such notice. In this event, the SELLER shall retain any and all sums paid by BUYERS as liquidated damages or as rental for the use of the premises during the period of occupancy by the BUYERS or his lessees.

It is undisputed that Seller never provided any notice that the contract was being declared null and void, Buyer was never asked to vacate the property, nor was she informed that any future payments would be treated as rent, rather than installment payments under the contract. In fact, Seller testified that payments for rent, taxes and insurance were late or not paid, but also testified:

> Q: In regards to this contract, if they did not comply with paying on a timely basis, what did you have the right to do at that point in time?
> A: I could ask them to move, to leave.
> Q: And did you at any point ever ask them to move?
> A: No, I never did.
> *****
> Q: As far as the contract, was there a provision if they were late in paying the rent that a late charge would be added to the payment?
> A: Yes.
> Q: Did you ever add a late charge?
> A: Not that I remember.
> *****
> Q: By the contract if they didn't pay it, you would have a right to cut them off in ten days and say the contract's null and void, why didn't you do that?
> A: I'm not that type person to do that.

Even if the tax payments, due on an annual basis, could be considered "monthly payments" subject to the Seller's right to declare the contract void, she never took that step.

Further, it is well settled that continued acceptance of late or non payment without notice that such will no longer be tolerated constitutes a waiver of a right to forfeiture of a contract. *Lively v. Drake*, 629 S.W.2d 900, 904 (Tenn. 1982); *American Nat'l Ins. Co. v. Davidson*, 166 Tenn. 13, 57 S.W.2d 788, 789-91 (1933); *Webb v. First Nat'l Bank and Trust Co.*, No. 74, 1990 WL 19643 at *1-2 (Tenn. Ct. App. Mar. 6, 1990) (no Tenn. R. App. P.11 application filed); *Dacus v. Weaver*, No. 29, 1988 WL 138918 at *2 (Tenn. Ct. App. Dec. 28, 1988) (no Tenn. R. App. P. 11 application filed).

For example, in *Lively*, our Supreme Court held that where late payments had been accepted over a period of two years without protest or complaint, the other party must be given notice to cure the arrears and that no further late payments would be accepted before foreclosure would be permitted. 629 S.W.2d at 904.

We cannot conclude that the contract was unenforceable due to late payments of tax reimbursements. Seller never provided any notice to Buyer that the established course of dealings between the parties was unacceptable, no notice was given that the late payments were unacceptable, Buyer was never provided notice that the contract would be deemed voided, Seller never gave Buyer ten days notice to vacate, nor did Seller give any other form of notice that late payments would no longer be acceptable. The fact that Buyer was current on the monthly purchase price payments and had made over seventy percent of the total payments under the contract further militates against any interpretation that Seller was relieved of her obligations under the contract. She was entitled to payment of the unpaid amounts, and the court properly ordered them paid out of the insurance proceeds.

Seller's other argument is that the contract prohibited its assignment without Seller's approval and that Buyer breached this provision. Seller asserts that the contract includes a provision allowing conversion of the sales arrangement to a rental arrangement upon any breach or termination.[3] We find no such provision in the contract. The provision to which Seller refers allows Seller to declare the contract void if Buyer is more than thirty days late in making a monthly payment. When that provision is revoked,

> In this event [notice of voiding the agreement], the SELLER shall retain any and all sums paid by BUYERS as liquidated damages or as rental for the use of the premises during the period of occupancy by the BUYERS or his lessees.

We read this language as allowing Seller to retain prior monthly payments if she declared the contract void because of late payment. Further, we do not find any language in the contract, nor any evidence in the record, to support the conclusion that Buyer was not allowed to have someone besides herself live in the home. The contract only provided that she could not assign the contract to someone else without Seller's consent. The record reveals testimony by both parties that they did not consider that the contract had been "assigned" to any one other than Buyer.

Additionally, the contract provision quoted above leads us to believe the parties contemplated that the property could be subleased during the installment period. Clearly, the language provides that occupancy may be by Buyer or her lessees. Therefore, there could be no breach of the contract by the mere fact that persons other than Buyer occupied the premises. Additionally, the record reflects Seller was aware Buyer's sister was living on the property and did not object; therefore the Seller acquiesced in the arrangement.

---

[3]Seller asserts that when Buyer's sister moved into the house in 1990, she considered the contract for sale to be terminated and the subsequent holding by Buyer's family members to be a rental arrangement.

8

Finally, Seller asserts that the trial judge improperly relied on the doctrine of "unjust enrichment" in its reasoning. Specifically, she claims that there is no unjust benefit she received from the insurance proceeds.

> Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation.

*Whitehaven Comm. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154-55 (1966)). Moreover, under the theory of unjust enrichment, "liability can be created where one person receives a benefit at the expense of another and it is unjust or inequitable for him to retain this benefit." *Newton v. Cox*, 954 S.W.2d 746, 747 (Tenn. Ct. App. 1997) (quoting *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991)).

In this case, the contract required that Buyer maintain fire insurance on the property and the evidence shows the parties orally agreed that Buyer would reimburse Seller for the premiums on her existing policy. Seller collected and credited these payments. Therefore, she was, in essence, holding the policy in trust for Buyer. While both an oral and written contract existed in this case, if Seller were allowed to keep the insurance proceeds, as well as the real property, she would receive a benefit for which she did not pay, and would thereby be unjustly enriched. While we do not think it necessary to rely on the doctrine of unjust enrichment, because the authorities discussed earlier provide the same result on the basis of other equitable principles, we do not find that the trial court erred in considering that doctrine as well.

IV.

The trial court applied the principles set out earlier regarding distribution of the insurance proceeds: payment of the remaining balance on the loan to Seller, with remainder to Buyer. It also granted Seller payment of unpaid taxes and insurance payments due from Buyer and reimbursement for expenses Seller incurred in cleaning up the property after the fire. We agree this was the proper method of allocating the proceeds.[4] However, the actual calculation of the amount of payments

---

[4]Buyer apparently disagrees with the calculations and asks this court "to modify what the Plaintiff should receive from the insurance proceeds that was above the purchase price." No specific suggestion is made as to an appropriate modification, but we interpret this statement as suggesting that the trial court should not have deducted the insurance and tax payments due from Buyer to Seller and the cleanup costs. However, Buyer has not specifically raised those deductions as an issue on appeal or provided any authority or argument regarding their propriety. In any event, we find no error in the court's decision to award those reimbursements to Seller out of the insurance proceeds otherwise due Buyer.

remaining on the loan is more problematic. In making that calculation the trial court accepted testimony from a question asked by Buyer's counsel to Seller:

> Q: My question is: Do you know what Donna owed you when the house burned and do you know what you owed the credit union when the house burned, two different figures, do you know what they are?
> A: I just paid the credit union what they said I owed them. I never figured Donna's. I guess could have figured it up in monthly payments.
> *****
> Q: For our calculation purposes, we could start at August 1, 1988, and figure all the months until October of 1995, or September, cutoff at October, and that would be how much she's paid you; is that right?
> A: Correct.
> Q: And then whatever's left owing is what was left out of that?
> A: I'm confused, but I think so.
> Q: Well, I calculated it up and she lacked 56 months paying you off when the fire happened.
> A: If you say so. I haven't figured it up.
> Q: That's just my calculation. Somebody else needs to do it too.

As the initial series of questions indicates, there appears to have been some confusion regarding the amount Seller still owed the credit union on the mortgage and the amount Buyer owed Seller under the installment sales contract. In other testimony Seller states she paid off the mortgage on the property with $6,700 of the proceeds from the insurance policy. The only relevant payoff figure, however, is the amount owed by Buyer to Seller. The law is that Buyer is entitled to have the insurance proceeds applied toward payment of her loan to Seller.

The judge also accepted an amortization schedule which was introduced through testimony of Seller. She testified that her ex-husband had run the schedule off some time prior in response to a question by Buyer's sister as to the payoff amount on the loan.[5] The amortization schedule is for a loan amount of $12,591.48 at 12% interest based on a payment of $215.64 for 88 months. There is no testimony in the record as to what the numbers represent. The findings and ruling of the court show that the judge accepted the statement that 56 months were left owed under the contract. However, using the amortization table, the trial court apparently used the remaining principal balance applicable after 56 payments had been made, rather than 56 payments remaining, and held that amount, $5,899, was what Seller was owed under the loan.

We agree with the methodology employed by the trial court. Seller argues that she was entitled to an amount calculated by the number of months remaining on the contract multiplied by

---

[5]The trial court indicated it was using "Defendant's figures" to calculate the payoff, and Seller disputes that the figures used by the court were her figures. Because of our resolution of the issue of calculation of the loan's payoff, Seller's arguments in this regard are moot.

the monthly payment amount of $215.21, a figure she asserts would be greater than the total amount of the policy proceeds. However, the contract states, "In the event that the BUYERS wish to pay the entire indebtedness off early they may do so depending upon Lakeside Employees Credit Union." Although we are not certain what the last clause was intended to mean, it is clear that the parties anticipated that Buyer could pay off the loan prior to its ten year expiration. Although Seller was entitled to the benefit of the bargain she made, selling the property for $4,000 more than she paid or financed to buy it and receiving 12% interest as long as the balance of the loan was unpaid, she was not entitled to 12% interest beyond the date Buyer paid the principal indebtedness.

The parties did not specify how the payoff amount would be computed, and resort to an amortization table is the usual and accepted method of making such a determination. However, the table used by the trial court was based on a principal amount and duration that do not match the terms stated in the contract between the parties. Therefore, we find that this amortization schedule is irrelevant to calculation of the payoff amount in this case.

There is no evidence in the record of an amortization schedule for $15,000 for 120 months at 12% interest. However, we are able to take judicial notice under Tenn. R. Evid. 201 of an amortization schedule based on these terms. Rule 201 states "[a] judicially noticed fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." "While a court can take judicial notice of a mathematical computation that is understandable to a layman . . . it cannot judicially notice a complex mathematical formula . . . in the absence of 'sources whose accuracy cannot reasonably be questioned.'" *Corbett v. Corbett*, No. 03A01-9601-CH-00008, 1996 WL 480741 at *4 (Tenn. Ct. App. Aug. 26, 1996) (no Tenn. R. App. P. 11 application filed) (quoting Tenn. R. Evid. 201(b)). The standard and readily available and accepted mathematical calculation of an amortization schedule may be judicially noticed. Therefore, we will use an amortization schedule for $15,000 at 12% interest to be paid in 120 months.[6]

The sales contract called for 120 monthly payments of $215.21. The first payment was made in August 1988, and the monthly payments were current as of September 1995. By our calculations, that equates to 86 payments having been made by Buyer prior to the fire. Therefore, only 34 payments, of the 120 contemplated by the contract, remained. Using the appropriate amortization schedule, after 86 payments are made, the remaining balance of the loan is $6,175.16. This is the amount Buyer owed Seller for the property at the time of the fire and is the amount properly credited to Buyer's principal balance from the insurance proceeds and awarded to Seller.

---

[6]We obtained a reliable and readily accessible amortization schedule from an amortization calculator located at http://www.townandcountryfinance.com/amort.htm and used the number of months of the contract, 120, at 12% interest for a loan amount of $15,000. Those facts produce a monthly payment of $215.22, and the contract herein provided for monthly payments of $215.21

11

We agree that the amount of delinquent payments due from Buyer to reimburse Seller for taxes and insurance premiums ($810) should also be deducted from the insurance proceeds, along with the costs of cleaning up the property ($2,500). Deducting, from the $11,000 of insurance proceeds, the $6,175.16 for remaining payments under the contract, $810 for owed taxes and insurance premiums and $2,500 for clean-up costs, the remainder from the policy proceeds is $1,514.84. Because the Seller was paid the insurance proceeds in this case, a judgment should accordingly be entered against Seller for the remaining proceeds of $1,514.84.

## V.

For the reasons stated herein, we affirm the order and judgment of the trial court that the title to the property at issue shall be vested with Buyer. However, we modify the amount of damages awarded and order that Seller pay to Buyer $1,514.84. Further, the costs of this appeal are taxed to the appellee, Ms. Coleman, for which execution may issue, if necessary.

_____
PATRICIA J. COTTRELL, JUDGE