IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2001 Session

# FREDERIC R. HARRIS, INC., v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

Direct Appeal from the Chancery Court for Davidson County
No. 95-537-II     Hon. Carol L. McCoy, Chancellor

No. M2000-02421-COA-R3-CV - Filed October 22, 2001

Plaintiff sued for payments under contract. The Trial Court held defendant was not liable for additional payments under the contract. We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

Peter H. Curry, Nashville, Tennessee, for Appellant Frederic R. Harris, Inc.

The Department of Law of the Metropolitan Government of Nashville and Davidson County, Karl F. Dean, Director of Law, Michael B. Bligh and John L. Kennedy, Nashville, Tennessee, for Appellee, The Metropolitan Government of Nashville and Davidson County, Tennessee.

## OPINION

In this action on contract, plaintiff, sued defendant alleging breach of contract, unjust enrichment, and estoppel. Defendant answered, admitting the terms of the contract, but averred that it had paid all amounts due.

The Trial Court granted defendant Summary Judgment, and plaintiff appealed. This Court, in remanding for trial said:

The Court below did not delve into the course of dealings of the parties, nor whether

the benefits of this arrangement were actually retained under circumstances which would make it unfair for FRH to go uncompensated. Thus, it is not necessary for this Court to address the accuracies of FRH's alleged cost under the contract. Nor is it necessary to decide the appropriateness of Metro's offer to settle the cost issue. It is enough to state that the contract between FRH and Metro was within the power of Metro to authorize. It is a question of material fact whether or not the contract on the part of FRH is partially executed or fully executed in matters relating to change order No. 6. . . .

Upon remand, a trial was held and the Trial Court found that Metro asked for bids for a feasibility study regarding its traffic control system. FRH was a leading expert in the field of traffic control design and implementation, and successfully bid the project. FRH had recommended that the system be based on a federally sponsored Uniform Traffic Control System, and FRH was to make the necessary enhancements. FRH recommended a mainframe computer which was purchased by Metro. The contract specified that the system would ultimately be used to synchronize 550 intersections. The Trial Court found that in 1986 FRH knew that using a single processor could create problems due to timing constraints, but FRH recommended the use of a centralized single processing unit.

For the years 1985 through 1989, there were five change orders approved by Metro. The first four change orders were initiated by Metro, and the fifth order was proposed by FRH, and increased the estimated costs by $176,780. The Court found that all five of the change orders complied with the 60 day notice provision in the contract.

On March 27, 1989, FRH advised Metro that it could not make the enhanced UTCS software work, and recommended that Metro forego the use of the UTCS software in favor of a new software program which FRH was developing called TMS. In April of 1989, FRH advised Metro in writing that it could not control the number of intersections required by the contract with the UTCS software. FRH once again suggested that Metro use the new TMS software, but did not submit an estimate of additional costs.

FRH worked on developing the TMS software through December 1991, and was developing the TMS software for other cities as well, including Austin, Fort Worth, and Honolulu. FRH billed identical amounts for travel, telephone, postage, and copy charges for all four cities. The court found that FRH's representative could not state whether the work charged to Metro was a duplication of work charged to the other three cities, and did not know what the total cost of development was. The court stated that the witness testified that the time billed to Metro was accurate and was for work actually performed, but the record did not support his assertion and "his credibility is undermined by evidence that the TMS software was already in the development stage when Harris proposed it as an alternative, that the TMS software was being developed and customized for several major U.S. cities, and that Harris assessed its expenses in a blanket pro rata fashion between the cities."

The Court further held that the TMS software never met the requirements set out in the technical manual, nor did it ever successfully test on all levels at once. Metro found the software to be deficient and unstable, and it continually had problems. Nonetheless, FRH sent letters to Metro requesting $287,029.00, and stating that these costs were incurred because FRH had to do additional work in order to fulfill its obligations under the contract. FRH submitted the sixth change order in 1992, even though it had begun work on the TMS software in 1989-1990. In February of 1994, Metro advised FRH that it was terminating the contract pursuant to Article 10, Section D, and sent FRH $27, 851.65. Metro did not have the UTCS software, because FRH had taken it back, and Metro used the TMS program somewhat between 1989 and 1993, but it never fulfilled the requirement to computerize 550 intersections. Metro does not now use the TMS program.

The Court held that FRH failed to perform its end of the contract when it could not make the UTCS software work, and that FRH then proposed to substitute the TMS software to fulfill its contractual obligations, but it did not provide Metro with any notice that the costs would be substantially greater than those set forth in the contract. The Court found that Metro allowed FRH to try and correct the problem by using the TMS software, but that this did not create an inducement upon which FRH relied in incurring more costs such that estoppel would come into play. The Court found the sixth change order was not submitted in a fashion in keeping with the parties' course of dealing, and was not properly submitted according to the contract's terms. Essentially, the Court held that FRH was to blame for problems with the software and hardware which FRH had recommended, and that it had complete control over the project. The Court dismissed the action on the basis that FRH failed to perform its obligations under the contract.

The issues raised on appeal are whether the Trial Curt erred in finding that FRH could not recover its costs under the doctrines of implied contract and/or estoppel, and whether the Trial Court erred in finding that FRH was not entitled to be paid for the work it performed up to the point that Metro terminated the contract, pursuant to Section 10D.

The findings of fact by the Trial Court are presumed correct unless the evidence preponderates against the finding. Tenn. R. App. P. 13(d). Questions of law are not accorded any presumption of correctness.

The contract between the parties provides that FRH would perform certain services for Metro, and that the cost of the same would not exceed $342,424.00. The contract provides that if the costs were going to exceed that amount, FRH was to notify Metro in writing and provide a revised estimate. The contract further provides that Metro would not be liable for such additional costs unless Metro notified FRH in writing that the costs had been increased, and specified in their notice a revised estimated cost. The contract specifies that any changes to the contract had to be incorporated as written amendments, and provides that the contract could be terminated by Metro at any time by giving fifteen days notice, and that if Metro terminated the agreement, FRH would be paid "incurred cost for completed or partially completed work, plus a pro rata portion of the Fixed Fee." The evidence supports the Trial Court's factual findings. Regarding change order six, the evidence establishes the first estimate of these additional costs was sent to Metro on December 31,

1991, requesting the $287,029.00 for work already done. Change order number six was never approved in writing, and FRH did not comply with the terms of the contract and/or with the parties' previous course of dealing in seeking this increase in costs.

The law in this jurisdiction is clear that when parties have an express contract dealing with a transaction, there can be no recovery either in quantum meruit or implied contract. *Jaffe v. Bolton*, 817 S.W.2d 19 (Tenn. Ct. App. 1991); *Fletcher Realty, Inc. v. Hayslope Properties*, 712 S.W.2d 478 (Tenn. Ct. App. 1986).

As to estoppel, the issue is whether Metro acted to induce FRH to perform the additional work and incur additional costs by promising that Metro would pay for the same. Under the terms of the contract, Metro was not obligated to pay costs in excess of the estimate unless such change was approved in writing by Metro after receipt of the revised estimate. Metro received the estimate at issue in December 1991, and received the change order at issue in May of 1992, but did not approve in accordance with the terms of the contract.

The record reveals that the cost request in the sixth change order had essentially been incurred prior to submitting the request.

Metro's representative admitted that he never called anyone at FRH during the time that the request for the additional cost was made in late 1991, until the contract was terminated by Metro. However, prior to 1991, Metro had no notice of what these costs would be or that there would be any. Accordingly, the evidence does not establish a promise or inducement by Metro to pay any costs incurred by FRH. Moreover, the evidence supports the Trial Court's conclusion that FRH was simply trying to fulfill its obligations under the contract, and Metro had no notice that any additional costs would be required. There is no basis to invoke the doctrine of estoppel against Metro.

Finally, FRH argued that it is due some additional compensation because Metro terminated the agreement "for its convenience". FRH had already been fully paid pursuant to the terms of the contract, moreover, Metro never received the full benefit for which it bargained. The termination clause does not abrogate the other terms of the contract, including FRH's duty to perform under the contract.

The material factual determination made by the Trial Court directed by this Court, upon remand, are fully supported by the evidence and we affirm the judgment of the Trial Court, holding that the plaintiff's claims are without merit.

The costs of the appeal are assessed to Frederic R. Harris, Inc.

_____
HERSCHEL PICKENS FRANKS, J.

-4-