IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2003 Session


AMERICAN EXCAVATORS, LLC v. RCR BUILDING
CORPORATION, ET AL.


**Appeal from the Chancery Court for Williamson County**
**No. 27213     R.E. Lee Davies, Chancellor**

———————

**No. M2002-01757-COA-R3-CV - Filed December 4, 2003**

———————


American Excavators, LLC ("Plaintiff") entered into a subcontract agreement with RCR Building Corporation ("Defendant") which required Plaintiff to perform excavation and utilities work for the Williamson County community services building.[1]  The subcontract agreement provided for certain excavation work to be done for a lump sum and states that "[a]ny additional undercutting and refilling of areas due to unsuitable soils will be done for a unit price of $12.50 per cubic yard." Plaintiff claims that while performing the work, it encountered a large amount of unsuitable soil that it removed and replaced.  Plaintiff later submitted change orders to Defendant requesting to be paid for the removal of the alleged unsuitable soil.  Defendant paid a portion of the change orders, but refused to pay the entire amount.  Plaintiff sued for breach of contract.  After a bench trial, the Trial Court dismissed Plaintiff's claims against Defendant.  Plaintiff appeals.  We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded.**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Todd E. Panther, Nashville, Tennessee, for the Appellant, American Excavators, LLC.

Gregory L. Cashion and S. Joseph Welborn, Nashville, Tennessee, for the Appellee, RCR Building Corporation.

———————

[1]The factual situation of this case is more involved than we discuss in this Opinion.  For purposes of simplicity, we discuss only the facts directly relevant to the issues on appeal.

# OPINION

## Background

Defendant contracted with the owner, Williamson County ("County"), to construct the Williamson County community services building ("Project"). Defendant then solicited subcontract bids for portions of the work.

Plaintiff submitted a subcontract bid proposing to install the utilities such as water and sewer and perform site work for the Project. Plaintiff's contractual responsibilities on the job were to include excavating the site to subgrade, which is the elevation necessary for construction. In order to reach subgrade, the topsoil would be stripped and then portions of land with a natural grade above subgrade level would be removed. This process is known as cutting. The portions of the property below subgrade level would need to be filled appropriately. If the soils below subgrade were unsuitable to build upon, those areas would need to be undercut and filled with suitable soil. Basically, unsuitable soil is soil that is not sufficiently compactable.

In preparing Plaintiff's bid, Harley Ezell, Plaintiff's estimator and project manager, referred to a soils report prepared for the County by a geotechnical engineer, Goodrich Testing & Engineering, Inc. ("GT&E"). The soils report showed that the material in the cut section would be suitable for use as fill. This meant that Plaintiff could move the material from the cut area to the fill area and less material would need to be imported onto the site for fill. The soils report indicated that there were two areas, the garden area and the gymnasium area, with potentially adverse soil conditions. However, the report indicated that the remainder of the material on site was suitable for building. The contract between Defendant and the County states that the soils report was provided for informational purposes only. Plaintiff prepared its bid estimating that approximately six inches of topsoil would be stripped from the site. The county provided fill at no cost for the Project.

Plaintiff's bid was accepted and Plaintiff and Defendant entered into a subcontract agreement. The subcontract agreement between Plaintiff and Defendant provides that "[a]ny additional undercutting and refilling of areas due to unsuitable soils will be done for a unit price of $12.50 per cubic yard." Plaintiff claims that the $12.50 per yard provision applies to unsuitable material both below subgrade and above subgrade. However, Mr. Ezell admits that neither the county, nor the architect, ever told Mr. Ezell that Plaintiff would be paid for unsuitable materials above subgrade. The subcontract agreement also provides "If there shall be any inconsistency between any provision of the Contract Documents between the OWNER and the CONTRACTOR and this Subcontract Agreement, then this Subcontract Agreement shall govern."

Once work on the project began, several problems were encountered. The survey did not match the plans and one of the four boundaries appeared to be off. As a result, Plaintiff had to "remove some additional trees, refrigerators, car bumpers and stuff like that. . . ." A problem was also encountered when some concrete pipe with a diameter of 18 or 24 inches was discovered in the ground running through the entire length of the property. Plaintiff had to excavate, remove and

dispose of the pipe and then fill in the area where the pipe had been. Mr. Ezell and Anthony Orange, Defendant's project superintendent, discussed the pipe and agreed that Plaintiff would be paid extra to remove the pipe and fill that area.

Ricky Tipper acted as Plaintiff's field superintendent for the Project. Mr. Ezell instructed Mr. Tipper to strip the topsoil on the site. However, Mr. Ezell did not tell Mr. Tipper to strip the topsoil to a specific depth. Rather, he assumed that Mr. Tipper had been in the construction business long enough to know what to do. When Mr. Ezell visited the site several days after the stripping began, he discovered that Mr. Tipper had "taken out approximately two and a half, three and a half feet of dirt," rather than the six inches provided for in the subcontract agreement. Mr. Ezell stopped his crew from stripping "[b]ecause this was a fill section. Anything that was unsuitable below the six inches was extra compensation. We couldn't go in and get out because every inch they took out over and above the six inches was material that we had to import back in to replace."

Mr. Ezell then called it to Mr. Orange's attention that there was a problem with the soil in the parking lot area. Mr. Ezell dug some test pits and he and Mr. Orange walked the site. The test pits revealed different strata of material, some of which appeared to be unsuitable. The test pits did not appear to be consistent with the original boring logs prepared by GT&E. A representative from GT&E was called out to the site. The GT&E representative stated that the soil thought to be unsuitable was brown silty clay that would be compactable under optimum moisture conditions and suitable for use as fill. Mr. Ezell disagreed, but told Mr. Orange that they would go ahead and leave the soil in if Defendant so instructed. Mr. Ezell claims that Mr. Orange instructed him to remove the soil. Plaintiff then called in their own geotechnical engineer, Southern Consulting ("Southern"), to get an opinion. Southern came out and stated that the soils were not compactable and not suitable for use as fill.

As a result of the disagreement between GT&E and Southern regarding the soil conditions, a third geotechnical engineering firm, PSI, was called to the site and a meeting was held on June 30, 1999, with representatives of Plaintiff, Defendant, the County, and PSI to discuss the condition of the site. It was decided at this meeting that both GT&E and Southern would be dismissed and Defendant would hire PSI to take over the soils testing. Under the subcontract agreement, Plaintiff had been responsible for paying the geotechnical engineer's fees. During the meeting, it was suggested that the site be taken down to subgrade and then PSI would document the areas that were unsuitable material.

As a result of the June 30 meeting, Mr. Ezell was asked to work up an estimate of what was going to have to be removed below subgrade due to unsuitability. After the meeting, Mr. Ezell wrote a letter to Defendant "submitting [a] proposal to deal with the unsuitable material encountered on this site." The letter states that Plaintiff had already removed approximately 600 yards of unsuitable material and did not charge for this removal. The letter estimates encountering another 1,000 to 1,700 cubic yards of unsuitable material on the site. In addition, the letter acknowledges that PSI will take over as the testing agency and requests that either a representative

of PSI or of Defendant be present while the work is performed to verify the actual quantities of unsuitable material. Plaintiff admits that it had an obligation to notify the geotechnical engineer when the excavations reached subgrade.

PSI did perform some testing on the site. They proof rolled and documented several areas of unsuitable soil. Proof rolling involves taking the area down to subgrade and then running a heavy piece of machinery over the area to establish if the subgrade is suitable to build upon. The geotechnical engineer watches during the process to see if the soil is giving, pumping up and down, or heaving. If the soil is giving, pumping up and down, or heaving, it is unsuitable to build on. Marshall Bassett from PSI stated "the same findings that we had in our test pits were a direct correlation to what [GT&E] had in their soils investigation."

Mike Leonard, the County's architect, attended the June 30th meeting and later prepared notes regarding the meeting. The notes document that "[s]everal pockets of 'non-compactable' soil" have been discovered on the site and that removal of these materials would be monitored by PSI. The notes also state that "[t]o the greatest extent possible, soil material available on site will be used for fill. Areas that currently require excavation below the estimated depth of the 'bad soil' (detention pond and main entry drive) will be used to acquire as much 'good' material as possible." The notes further state that Defendant was to work up an estimated quantity of bad material and a price for removal.

Mr. Tipper claims that as the job progressed, he kept Mr. Orange informed as they ran into unsuitable soil and that in most cases Mr. Orange would instruct them to take the soil out. Mr. Tipper states that Mr. Orange "would have the geotechnical people come out and look at, but most of the time he would just tell me to take it out." Mr. Tipper further claims that Mr. Orange told him to "keep up with how many loads of material it took to bring the job back up to subgrade" in order to document the amount of unsuitable soil. Mr. Tipper claims that he was told to do this regarding "[t]he whole unsuitable material, [the concrete pipe], the whole job . . . ."

Mr. Tipper asserts that "[t]he whole job was unsuitable. . . . there were spots that we didn't have to take out but in general the whole site was unsuitable from the entranceway up the road - - the best area that we didn't have to take much out of was this building pad and the back leg of this building pad. . . . Most of the entranceway was undercut. It was even undercut right down here at the very entrance. I mean, basically the whole job." Mr. Tipper claims that none of the material in the cut section above subgrade was suitable for use as fill. Mr. Tipper, however, is not a geotechnical engineer.

Mr. Orange disputes the claim that he instructed Plaintiff to remove so much soil. Mr. Orange admits that he directed Plaintiff to remove soil in two specific areas, the area where the concrete pipe was encountered and an area in the drive due to the excessive amount of truck traffic. Mr. Orange asserts he did not tell Plaintiff to keep up with the truck tickets to document undercutting because that "would be kind of giving him a blank check if I told him just to keep up with the loads."

Plaintiff admits that neither the county, nor the architect, ever directed Plaintiff to remove any material other than what PSI had authorized. Beyond the areas that the parties agree were authorized by PSI, Plaintiff cannot identify from which areas on the site the unsuitable materials were removed.

Plaintiff submitted several change orders to Defendant for payment. Portions of the change orders dealt with unverified soil claimed to be unsuitable. Some confusion was involved regarding payment of the change orders, but in the end, Defendant paid only a portion of the change orders. Defendant did pay the portions of the change orders dealing with the areas that PSI had verified as unsuitable. Plaintiff then sued Defendant for breach of contract claiming that Defendant failed to pay for removal of unsuitable soil as provided in the subcontract agreement. Defendant filed a thirty party complaint against the County.

After a bench trial, the Trial Court granted the County a "directed verdict", dismissed Plaintiff's claims against Defendant, and entered judgment in favor of Defendant against Plaintiff in the amount of $55,000 for its attorney's fees and expenses. Plaintiff then filed a motion to alter or amend the judgment. The Trial Court altered the attorney's fees awarded in the judgment from $55,000 to $46,843.50, but denied the remainder of the motion to alter or amend. Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises six issues on appeal: 1) whether the Trial Court erred in ruling that there were no modifications to the subcontract; 2) whether the Trial Court erred by placing the burden of proving the existence of unsuitable material on Plaintiff; 3) whether the Trial Court erred in considering Plaintiff's delay in presenting the fourth pay application; 4) whether the Trial Court erred in making its decision based upon a suspicion that Plaintiff underbid the project; 5) whether the Trial Court erred in finding that the subcontract does not entitle Plaintiff to recover additional compensation for removing unsuitable materials above subgrade; and 6) whether the Trial Court erred in finding that Plaintiff calculated its damages by extrapolation. We will address each issue in turn as necessary.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We begin by considering whether the Trial Court erred in ruling that there were no modifications to the subcontract. In its Memorandum Opinion entered February 15, 2002, the Trial Court found:

> The meeting of June 30, 1999 and the subsequent positions taken by each of
> the three parties are consistent with the terms of both the master contract between the

County and [Defendant] and the subcontract between [Defendant] and [Plaintiff].
The Court finds there was no modification of the obligations of each party as they
existed under the original written contracts.

Plaintiff argues that the evidence preponderates against this finding, in part, because the evidence
shows that the responsibility for geotechnical testing was shifted from Plaintiff to Defendant after
the June 30th meeting. The parties agree that several things happened as a result of the June 30th
meeting; both GT&E and Southern were dismissed, PSI was hired by Defendant to perform future
geotechnical testing, and Plaintiff agreed to credit Defendant for the unused geotechnical fees
provided for in the subcontract. Plaintiff argues that these agreements affected its right to be paid
for removing unsuitable material. Plaintiff claims that after the June meeting, it no longer had the
right to contact the geotechnical engineer to establish if materials were unsuitable, and, therefore,
the subcontract was modified.

Plaintiff has misconstrued the Trial Court's finding. The Trial Court found that "there
was no modification of the *obligations* of each party as they existed under the original written
contracts." (emphasis added). The evidence supports this finding. There is no dispute that, both
before and after the June 30th meeting, Plaintiff is entitled to be paid only for removal of unsuitable
soils and not for the unnecessary removal of suitable materials. There also is no dispute that, both
before and after the June 30th meeting, the determination of whether material was unsuitable was
to made by a geotechnical engineer. In addition, both before and after the meeting, Defendant was
obligated to pay for the removal of material determined by the geotechnical engineer to be
unsuitable. Despite the shift of responsibility for contacting the geotechnical engineer, the evidence
shows that the relevant obligations of the parties remained unchanged after the meeting. The
evidence does not preponderate against the Trial Court's finding that there was no modification to
the relevant obligations of each party.

Next, we consider whether the Trial Court erred by placing the burden to prove the
existence of unsuitable material on Plaintiff. With regard to burden of proof, our Supreme Court has
stated:

With respect to the question of who bears the burden of proof, it is a general
principle in Tennessee that the burden rests on the party who affirms, not on the party
who denies. . . . '[t]he burden of proof is on the party having the affirmative of the
issue, and the burden of proof never shifts. The plaintiff had the burden of proving
the elements of her theory of recovery and the facts which she alleged in her
complaint.'"

*Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 783 (Tenn. 2000) (citations
omitted).

Plaintiff argues that the responsibility to determine if there was unsuitable soil was
assumed by Defendant when PSI was hired. Plaintiff argues that because it no longer had the
responsibility for contacting the company who was to perform the geotechnical testing that it was
impossible for Plaintiff to prove the existence of unsuitable soils. Based upon this impossibility,

Plaintiff asserts that there are several different theories that would allow Plaintiff to recover for the extra work performed. We disagree.

Plaintiff sued for breach of contract. As a matter of law, Plaintiff carries the burden of proving each element of its breach of contract claim. As Plaintiff claims that Defendant is in breach by not paying Plaintiff for the removal of unsuitable soil, Plaintiff has the burden of proving that the soil removed was unsuitable. If the soil were suitable for building, Plaintiff would not be entitled under the contract to be paid. Nothing in the contract prohibited Plaintiff from undertaking tests to prove that the soil it was removing was, in fact, unsuitable. Plaintiff always had that option.

Further, the evidence does not preponderate against the Trial Court's finding that the soil was suitable, not unsuitable. Mr. Bassett, a geotechnical engineer from PSI, testified that the soil was suitable for building. Eric Snyder, the geotechnical engineer who prepared the GT&E soils report, testified that the soil was suitable. In addition, the soils report prepared by GT&E was made an exhibit at trial. The only evidence Plaintiff produced to the contrary was the testimony of Mr. Ezell, Mr. Tipper, and Marvin Parker, Plaintiff's chief manager, that they believed the soil was unsuitable. However, Mr. Ezell, Mr. Tipper, and Mr. Parker are not geotechnical engineers. Thus, the evidence does not preponderate against the Trial Court's implicit finding that the soil was suitable when it found that Plaintiff failed to prove that the soil was unsuitable.

No matter who was responsible for contacting the geotechnical engineer, Plaintiff had the burden of proving each and every element of its breach of contract claim in order to prevail. Plaintiff did not carry its burden at trial of proving that the soil removed was unsuitable. We find no error in regard to this issue.

Plaintiff also claims it is entitled to recover under theories of quantum meruit or implied-in-fact contract. These theories are quasi contractual in nature. As this Court has stated:

> Quasi-contractual liability can be created where one person receives a benefit at the expense of another and it is unjust or inequitable for him to retain this benefit. The most important factor for recovery under a quasi-contractual theory is that the enrichment must be unjust. The primary purpose of implied contracts is to impose an obligation that ought to be done as a matter of justice and equity in the absence of express contracts. A contract cannot be implied, however, where a valid contract exists on the same subject matter.

*Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991) (citations omitted). Since there is a valid contract that addresses the subject matter, quasi-contractual theories do not apply. Plaintiff cannot recover under these theories.

Plaintiff further argues that Defendant should be estopped from denying payment. Plaintiff claims that Defendant was present while the material was being removed, that Plaintiff informed Defendant about the unsuitable material, and that Defendant directed Plaintiff to remove

the material and keep up with the truck loads. Defendant disputes that it knew about the claimed unsuitable material or that it ever instructed Plaintiff to remove the material and just keep up with the truck loads. Resolution of this issue, thus, hinges upon factual findings and credibility determinations made by the Trial Court.

"When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

The Trial Court saw and heard the witnesses and did not find that Defendant should be estopped from denying payment. By implication, the Trial Court found the testimony and other evidence in favor of Defendant to be more credible. We accord the Trial Court considerable deference in weighing oral testimony and determining credibility. The evidence does not preponderate against the Trial Court's findings which led it to hold that Defendant should not be estopped from denying payment. We find no error here by the Trial Court.

Plaintiff also claims that an excuse of a condition precedent entitles it to payment. Plaintiff claims that under the subcontract, a determination that the soil is unsuitable is a condition precedent to Defendant's duty to pay. We agree with this assertion. Plaintiff further claims that Defendant was under a duty not to hinder or frustrate the occurrence of the condition, the verification that the material was unsuitable. Plaintiff apparently claims that Defendant refused to take steps to verify the unsuitability of the material and, thus, excused the condition precedent to payment. As with the issue of estoppel discussed above, this issue hinges upon factual findings and credibility determinations made by the Trial Court. The record is devoid of evidence showing that Defendant hindered or frustrated any attempts by Plaintiff to verify that the material was unsuitable. Nor was any evidence produced showing that Plaintiff was prohibited at any time from testing the soil. The evidence does not support a finding that Defendant excused the condition that the soil be unsuitable before Defendant would be obligated to pay for its removal.

Our resolution of the issue regarding Plaintiff's burden of proving the soil unsuitable renders Plaintiff's remaining issues moot. Even if the Trial Court erred in regard to some other issue, and we in no way suggest that any error occurred, any error in regard to these issues was harmless as Plaintiff did not prove the elements of its breach of contract claim and was not entitled to prevail. We, therefore, affirm the Trial Court's dismissal of Plaintiff's claims against Defendant.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below.  The costs on appeal are assessed against the Appellant, American Excavators, LLC, and its surety.


_____
D. MICHAEL SWINEY, JUDGE