**Paul H. JAFFE and Sol I. Jaffe, Individually and d/b/a S & B Properties, A Joint Venture, Plaintiffs/Appellants,**

**v.**

**Charles Earl BOLTON and James N. Bolton, Defendants/Appellees.**

Court of Appeals of Tennessee, Western Section, at Jackson.

April 9, 1991.

Application for Permission to Appeal to Supreme Court Denied Sept. 9, 1991.

Erich W. Merrill, Memphis, for plaintiffs/appellants.

Leo Bearman, Jr., Charles F. Morrow, Memphis, for defendants/appellees.

FARMER, Judge.

The plaintiffs, Paul H. Jaffe and his brother, Sol I. Jaffe, own certain property known as 3585 and 3595 Southern Avenue and 585 Patterson Street in Memphis, Tennessee. In May of 1983, Charles Bolton (hereinafter "Chuck") contacted Paul Jaffe (hereinafter "Jaffe") about leasing this property. Jaffe and Chuck had an initial meeting in which they reviewed a set of plans of the property. After reviewing the plans, Chuck decided he could do something productive with the property. Specifically, Chuck wanted to open a restaurant and nightclub. There had been a large fire in the buildings on this property in March of 1983. Therefore, the property was basically in an untenable condition at this time. Chuck got a set of keys from Jaffe after their initial meeting and immediately began a cleanup process.

Chuck and a friend cleaned up a considerable amount of the debris from the fire, filling thirty dumpsters and hauling off some forty truckloads. The cleanup lasted approximately two and one-half months. During this period the parties discussed the terms of a proposed lease. A letter of intent dated June 29, 1983 was eventually signed by the parties. Ultimately, on September 21, 1983, the parties executed a lease agreement.

After signing the lease Chuck and his father, James Bolton, made significant improvements to this property. James Bolton paid for all of these improvements. Allegedly, the Boltons made improvements to the leasehold totaling $185,109.84. Among other things, Chuck discovered that the roof on the buildings had to be replaced. The only leaks that Jaffe allegedly pointed out to Chuck and circled on the plans were three leaks on the east building and one on the west. In addition, Jaffe allegedly told Chuck that there was a "small" problem with the air conditioning. In reality, all of the air conditioning systems with the exception of one had to be replaced. Furthermore, Chuck had planned to make a circular bar in the middle of one of the buildings. On the plans Jaffe showed Chuck, this wall was designated a non-load-bearing wall. However, when Chuck went on the premises and began to tear down the wall, bricks started falling. An engineer was called and informed Chuck that the wall was, in fact, a load-bearing wall. Therefore, it could not be torn down unless an I-beam was installed at a cost of $17,000. As a result of this discovery the whole layout of the building was changed and additional expense incurred. Chuck also determined that the plumbing and the electrical system in the buildings would not pass code inspection; therefore, he had to do extensive repair to bring them up to code.

Prior to the execution of the lease, Jaffe informed Chuck that a guarantor would be necessary as security to the lease. Chuck informed Jaffe that Daniel Cane had agreed to sign as guaranty. In reliance upon this, Jaffe included the following provision in the lease agreement:

> 32. This agreement is contingent upon Daniel A. Cane and wife signing the attached guaranty (no. 33); in the event they do not sign guaranty by October 12th, 1983, this agreement is null and void and tenant forfeits his deposit of $8,000.—

Daniel Cane and his wife ultimately refused to sign as guarantors on the lease. In December of 1983, Jaffe demanded that Chuck produce a guarantor. On January 27, 1984, Chuck and Jaffe entered into an agreement whereby Chuck was given until February 29, 1984 to comply with the guarantor provision of the lease. Jaffe met with Chuck on February 23, 1984 and informed him that if James Bolton did not sign as guarantor then he would lease the property to someone else. Thereafter, James Bolton signed as guarantor. However, at the time he was signing he told Jaffe that it's "like you've got a gun to my head, and remember, this is duress." James Bolton had personally invested $350,000 of borrowed capital and $100,000 cash in his son's operation.

Subsequently, the restaurant closed at the end of July or the beginning of August of 1984. The corporation under which the business was operating filed Chapter 11 bankruptcy and Chuck defaulted on the rent. Thereafter, Jaffe filed suit in the Chancery Court of Shelby County against the defendants, Charles Bolton and James Bolton, seeking recovery of past due rents. Additionally, Jaffe alleged that an air conditioning contractor had filed a mechanics lien suit against the real estate leased to the defendants for repairs made at the defendants' request and sought recovery for the amount of the mechanics claim in the sum of $500. Furthermore, Jaffe sought recovery for an increase in insurance premiums due to the buildings being unoccupied.

A hearing was held in this matter on June 28, 1985, and the trial court found: (1) that the lease and guaranty provision were entered into in a businesslike manner without any fraud or overreaching; (2) that Jaffe had failed to mitigate his damages; (3) that Jaffe was entitled to a judgment against both of the defendants for $4,000 per month from September 21, 1983, through June 28, 1985, less the deposit of $8,000, also less the three months allowed for improvements by Jaffe, plus the mechanics lien of $500; (4) that the plaintiff was unjustly enriched and the court ordered a reference to the Clerk and Master to determine the enhanced value of the improvements made on the property by the Boltons and a determination of reasonable attorney's fees.

On August 7, 1989, a report of the Master was filed wherein he found that:

> Defendants spent a total of $175,527.61 in cleaning, demolishing, remodeling and repairing of the premises. The Master finds that the defendants did not carry their burden of proof in regard to the enhancement of value of the improvement except as to. . . .
>
> TOTAL: $69,871.12.

In addition, the Master found that reasonable attorney's fees plus expenses were equivalent to $12,307.79. The Chancellor thereafter entered a judgment for the defendants because the amount of rents, attorney's fees, and expenses which plaintiffs were entitled to was less than the value of the enhancements, $69,871.12.

It is from this judgment that the parties have appealed. The issues on appeal are:

1. Did the trial court err in allowing defendants to set off, against the rent they owe plaintiffs under the lease here involved, part of the amount defendants spent in remodeling defendants' building, for their own impractical, specialized restaurant operation, when the lease, Trial Exhibit 3, specifically provided that (a) the premises were leased "as is"; (b) the tenant would "repair, remodel, and maintain premises during the term of lease"; (c) the landlord would forgive three months' rent in consideration of the ten-

ant's repairing and remodeling the premises; and (d) that all additions and improvements, except furniture or movable trade fixtures, "shall be the property of the landlord and shall remain upon ... the premises as a part thereof at the termination of this Lease, without compensation to the Tenant," and plaintiffs had no use for the specialized restaurant building that was designed and remodeled by defendants?

2. Did the trial court err in holding that plaintiffs failed to mitigate their damages, where there was no showing that plaintiffs could have found another tenant for the premises as amateurishly remodeled by defendants, nor was there any proof as to how much plaintiffs could have leased the premises for, and where the defendants' proof showed that defendants kept possession of the property up to the time of trial, that defendants had ten different real estate brokers trying to sublease the premises, and contacted 40 to 50 individuals in an effort to sublease the premises, but were unable to find anyone who was interested in subleasing the restaurant that had been remodeled by defendants, who had had no experience in the restaurant business?

3. Did the actions of plaintiffs constitute economic duress and overreach the bounds of fairness?

4. Did the trial court err in failing to allow plaintiffs interest on the rent due plaintiffs?

5. Did the trial court err in affirming the report of the Master, finding that some of defendants' remodeling expenses enhanced the value of the improvements to the extent of $69,871.12, where the Master also found that plaintiffs had been offered $345,000 for this property before the lease with defendants was executed, and further found that this property was sold by plaintiffs for $329,000 for a florist shop, after defendants had remodeled the premises for a highly specialized restaurant that quickly failed?

6. Did the trial court err in allowing defendants to amend their answer so as

to plead defendants' expenses incurred in remodeling the premises for a fancy restaurant as an affirmative defense and set-off against rent they owed to plaintiffs under the lease here involved, and so as to plead as an affirmative defense that plaintiffs had failed to mitigate their damages, by order entered approximately nine months after the trial, and four months after the court had entered a decree ruling on the rights of the parties, where these affirmative defenses were not raised in the defendants' answer, as required by Rules 8 and 12 of the Tennessee Rules of Civil Procedure, and were not litigated at the trial?

## I.

### Set-off

As we have noted, the trial court allowed the Boltons a "set-off" against their damages as a result of the "enhanced value of the improvements made on said property by defendants." The general rule is that a tenant who voluntarily makes improvements on leased property is not entitled to reimbursement. *Parsons v. Hall,* 184 Tenn. 363, 199 S.W.2d 99 (1947). There are exceptions to the general rule, however, and one such exception was set forth in *Taylor v. Gunn,* 190 Tenn. 45, 227 S.W.2d 52 (1950). In *Taylor* the parties' lease provided in pertinent part:

"2. That the Lessee will keep in good repair and in first class condition, said premises and the improvements thereon, except the roof. That he will keep in good repair and condition, at his expense, all of the plumbing system and electrical wiring system therein, both upstairs and downstairs, and in the stairway. Lessee further covenants he will keep said entire building painted inside and outside in a nice and suitable manner. In addition to any other rights Lessor may have herein, the Lessor may, if Lessee fails to keep the above covenants in a satisfactory manner, have such repairs made and painting done, at the expense of Lessee, and Lessee agrees to pay Lessor therefor. However, any such action by the

Lessor in making such repairs, or any failure of the Lessee to make the same, or to pay for any repairs made by the Lessor, shall not operate to release the Lessee from this lease or the covenants thereof.

"3. That the said Lessee will return said premises to the Lessor at the end of the term, in as good condition as received, except for any loss or damage thereto caused by reasonable use thereof or wear and tear.

"4. That the Lessee will not make any structural changes in said building, remove or change doors or partitions therein, unless the consent of Lessor thereto is given in writing."

227 S.W.2d at 53.

After this lease was executed, the county fire marshal demanded that the landlord raise and structurally rebuild the front wall of the leased building. In addition, the marshal required that new chimney flues be constructed. Nothing was mentioned in the lease as to who would bear the expense of repairs necessitated by public authorities; therefore, a controversy arose regarding who was responsible for these structural changes. The court found that, when structural changes or improvements are ordered by a public authority which are extensive and permanent in nature and materially add to the property value, then the duty to bear the expense of these improvements rests with the landlord. *Id.* at 55. The court made it clear, however, that the basis for this decision was the fact that these improvements were not in the contemplations of the parties at the time of the contract. If the lease had manifested a contrary intention, then the lease would control. *Id.* at 54.

■ In the present case the trial court awarded the defendants a set-off for numerous expenses which were clearly not ordered by a public authority. As to these, the general rule is applicable and the trial court clearly erred in allowing a set-off for such. In addition, however, the defendants were required to do extensive plumbing and electrical work before the buildings would be approved under existing codes.

The question then becomes whether the lease manifests the parties' intentions to impose a duty upon the tenant to incur these expenses.

The lease specifically provided that the "[p]remises are leased 'as-is'; tenant will repair, remodel, and maintain premises during term of lease." In addition, the lease stated:

The Tenant has examined the demised premises, and accepts them in their present condition (except as otherwise expressly provided herein) and without any representation on the part of the Landlord or its agent as to the present or future condition of the said premises. The Tenant shall keep the demised premises in good condition, and shall redecorate, paint and renovate the said premises as may be necessary to keep them in repair and good appearance. The Tenant shall quit and surrender the premises at the end of the demised term in as good condition as the reasonable use thereof will permit. The Tenant shall not make any alternations, additions, or improvements to said premises without the prior written consent of the Landlord. All erections, alterations, additions and improvements, whether temporary or permanent in character, which may be made upon the premises either by the Landlord or the Tenant, except furniture or movable trade fixtures installed at the expense of the Tenant, shall be the property of the Landlord and shall remain upon and be surrendered with the premises as part thereof at the termination of this Lease, without compensation to the Tenant. The Tenant further agrees to keep said premises and all parts thereof in a clean and sanitary condition and free from trash, inflammable material and other objectionable matter. If this lease covers premises, all or a part of which are the ground floor, the Tenant further agrees to keep the sidewalks in front of such ground floor portion of the demised premises clean and free of obstructions, snow and ice.

Furthermore, the lease provided that the "[r]ents for the first three months are

waived in consideration of Tenant repairing and remodeling premises in accordance with plans submitted."

■ The primary rule for interpreting written instruments is to ascertain the intention of the parties. *Walker v. Tennessee Farmers Mutual Insurance Co.,* 568 S.W.2d 103 (Tenn.Ct.App.1977); *Trailmobile, Inc. v. Chazen,* 51 Tenn.App. 576, 370 S.W.2d 840 (1963). In determining the parties' intentions, the word or phrases contained in the instrument will be given the ordinary and usual meaning, unless otherwise expressly provided, with the language contained therein is unambiguous. *Peoples Bank v. Baxter,* 41 Tenn.App. 710, 298 S.W.2d 732 (1956); *Seeley v. Pilot Fire & Casualty Co.,* 222 Tenn. 33, 432 S.W.2d 58 (1968).

■ As we have mentioned, the parties' contract contained an "as-is" clause. Essentially an "as-is" clause means that the buyer or lessee is purchasing or leasing the goods or property as it is in its present state or condition. This generally implies that the property is taken with whatever faults it may possess and implies that the seller or lessor is released of any obligation to reimburse the purchaser or lessee for losses or damages that result from the condition of the goods or property. *See Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank,* 117 Ill.App.3d 284, 72 Ill.Dec. 665, 671, 452 N.E.2d 1361, 1367 (1983). The "as-is" clause basically refers to the obvious or reasonably discernible defects in the property. *Mulkey v. Waggoner,* 177 Ga. App. 165, 338 S.E.2d 755, 757 (1985).

■ What is noteworthy in this case is the fact that these code violations existed at the time the parties entered into this contractual arrangement. Therefore, when property is leased "as-is" both parties are charged with the knowledge of their existence, particularly when the property has suffered such extensive fire damage. Furthermore, the lease also specifically provided that the "[r]ents for the first three months are waived in consideration of Tenant repairing and remodeling premises...." It was clearly in the contempla-

tion of the parties that significant repairs and remodeling would take place before the property would be in a tenable condition. Both parties were well aware that a fire had occurred on this property and that substantial repairs were required before operations could progress. The defendant proceeded to make all repairs to this property and made all the necessary changes to comply with these code provisions. The tenant never requested the landlord to incur these expenses, but instead voluntarily assumed the responsibility for such.

■ Even though a result is unjust or harsh, in the absence of fraud or mistake a contract must be interpreted and enforced as it is written. *Percy Galbreath & Sons, Inc. v. Dehyco Co. Inc.,* 548 S.W.2d 664 (Tenn.Ct.App.1976); *E.O. Bailey & Co. v. Union Planters Title Guaranty Co.,* 33 Tenn.App. 439, 232 S.W.2d 309 (1950). The trial court specifically found that there was no evidence of fraud in this case. Specifically the trial court stated that:

Under the proof adduced in this cause the Court fails to find the negotiations and acts leading to the consummation of the contracts and the actions of the parties subsequent thereto, were over-reaching or of a fraudulent nature....

To be sure it [the lease] was a strenuous contract in many ways but was conducted in a business-like manner with a man like James Bolton of the business world for many years, who certainly was famililar [sic] with the business at hand and decided to take a chance to see if he could succeed in the business. It was unfortunate that the business was unsuccessful.

In allowing for a reasonable interpretation of the language of this lease agreement, it is clear that the lessor did not intend to incur any expense in making repairs. In addition, it is as equally clear that the lessee decided to take the property as it was at the time the parties entered into the lease agreement. We are not saying that an "as-is" clause should be interpreted to mean that, if structural changes and material alterations are thereafter required for a building to conform to local

codes or city ordinances, that the tenant should necessarily be held responsible for these. *See Kanes v. Koutras*, 203 Ga. 570, 47 S.E.2d 558 (1948). However, when these code violations are in existence at the time the parties contractually bind themselves, and the tenant voluntarily assumes the responsibility for making these necessary repairs, he cannot thereafter seek recoupment, set-off or damages for his expenses incurred.

■ Bolton also contends that this set-off was justified under the theory of unjust enrichment. The trial court determined that Jaffe was unjustly enriched by the enhancements or improvements to the buildings. In making this determination the court considered the maxim of equity which states: "Equity will not suffer a wrong without a remedy."

■ Quasi-contractual liability can be created where one person receives a benefit at the expense of another and it is unjust or inequitable for him to retain this benefit. 7 Tenn.Juris. *Contracts* § 103 (1983); *Browder v. Hite*, 602 S.W.2d 489 (Tenn.Ct.App.1980). The most important factor for recovery under a quasi-contractual theory is that the enrichment must be unjust. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966). The primary purpose of implied contracts is to impose an obligation that ought to be done as a matter of justice and equity in the absence of express contracts. *Hill v. Childers*, 18 Tenn. 514 (1837). A contract cannot be implied, however, where a valid contract exists on the same subject matter. *Taillie v. Chedester*, 600 S.W.2d 732 (Tenn.Ct.App.1980).

In the instant case the parties expressly provided that:

All erections, alterations, additions and improvements, whether temporary or permanent in character, which may be made upon the premises either by the Landlord or the Tenant, except furniture or movable trade fixtures installed at the expense of the Tenant, shall be the property of the Landlord and shall remain upon and be surrendered with the premises as a part thereof at the termination

of this Lease, *without compensation to the Tenant.* (Emphasis added)

Although the results in this case may be harsh, the "quasi-contractual principle of unjust enrichment does not apply to an agreement deliberately entered into by the parties, however harsh the provisions of such contract may seem in the light of subsequent happenings." 17 C.J.S. *Contracts* § 6 (1963).

The agreement entered into between the parties expressly provided the landlord was to retain the benefit of all the improvements to the property without any compensation to the tenant. This agreement was entered into in a businesslike manner, and the tenant cannot now complain that the landlord is unjustly enriched. For all the foregoing reasons the trial court's allowance of a set-off under the theory of unjust enrichment in the sum of $69,871.12 was in error and is hereby reversed.

## II.

### *Mitigation of Damages*

■ Jaffe contends that the trial court erred in finding that he failed to mitigate damages. The trial court specifically found that:

[T]he plaintiff knew the business failed and was closed. This matter was made known to him because of the increase in insurance he was assessed with. Nothing in the record shows that he attempted to rent the building or in any way mitigate the damages except to wait for the entire time and collect the full amount of rent with all the costs attached thereto. It was argued by the plaintiff that he still did not have possession of the premises. The Court must insist that on proper motions he could have obtained possession of the property at any time thereafter had he sought same, and he could have certainly obtained possession at the time of the trial of same on June 28, 1985.

■ In this jurisdiction, a landlord is under a duty to mitigate damages upon the abandonment of the premises by the tenant. *Hailey v. Cunningham*, 654 S.W.2d

392 (Tenn.1983); *See* 49 Am.Jur.2d *Landlord and Tenant* § 621 (1970); 52 C.J.S. *Landlord and Tenant* § 498 (1968). To constitute abandonment of the leased premises there must be an absolute relinquishment of the premises by the tenant evidenced by an act and an intent to abandon. 17 Tenn.Juris. *Landlord and Tenant* § 29 (1984); *See Schnitzer v. Lanzara*, 115 N.J.L. 332, 180 A. 234 (1935); *Moore v. Northwest Fabricators, Inc.*, 51 Wash.2d 26, 314 P.2d 941, 942 (1957).

In the instant case not only did the defendants not intend to abandon the premises, but they actually refused to relinquish the premises. James Bolton testified that he offered to turn the premises back over to Jaffe if he would pay them $185,000, the alleged cost of the improvements. Other than this contingent offer, however, the defendants took no steps to abandon the premises.

■ The landlord in this cause was certainly not obligated to surrender to the unfounded demands of the tenant in order to take possession of the property. Neither was he under an obligation to forcibly eject the tenants from their premises to relet the property. The tenant was well aware that he had breached his contractual obligation to pay rent as contained in the lease agreement, nevertheless, in full knowledge of this breach he continued to retain possession of the premises. A tenant cannot refuse to relinquish possession and also claim that the landlord failed to mitigate his damages. Nonetheless, in spite of the trial court's finding that Jaffe had failed to mitigate his damages, the court still awarded the full amount of arrearages payable at the time of trial. Therefore, this error had no effect on the final judgment in this cause.

### III.

#### Economic Duress

■ The defendants contend that the trial court erred in finding that Jaffe's actions did not constitute economic duress. The defendants contend that Jaffe's threats to lease the building out under them in the event that James Bolton did not sign as guarantor constituted "economic duress" such that they should be relieved of liability under the contractual agreement.

As we have noted, James Bolton stated to Jaffe as he was signing as guarantor that it's "like you've got a gun to my head, and remember, this is duress." Jaffe himself even testified that James Bolton stated, "You've got me over a rack, and I don't want to sign this." The defendants contend that since Jaffe knew that James Bolton had invested $450,000 into this business, then his threats to rent the property out from under them were so severe and intimidating that he was acting contrary to his own free will.

Duress has been defined as "an unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination." *Federal Deposit Insurance Corp. v. Ramsey*, 612 F.Supp. 326, 328 (E.D.Tenn.1985), quoting *Johnson v. Ford*, 147 Tenn. 63, 86, 245 S.W. 531 (1922). Essentially, Jaffe insisted that Chuck comply with the provisions as set forth in the lease, that being that Chuck obtain a guarantor. Jaffe had every right to insist on this compliance. The fact that James Bolton felt pressure and compulsion economically to sign as guarantor is of little significance. Chuck could have provided Jaffe with another guarantor that met Jaffe's approval. Jaffe merely required Chuck to do what he was otherwise obligated legally to perform. This is not economic duress.

### IV.

#### Prejudgment Interest

■ Jaffe contends that the trial court erred in failing to award him prejudgment interest. The defendants, on the other hand, argue that an award of prejudgment interest is largely in the discretion of the trial court, *See In re Estate of Cooper*, 689 S.W.2d 870, 872 (Tenn.Ct.App.1985), *citing B.F. Myers & Son of Goodlettsville, Inc. v. Evans*, 612 S.W.2d 912, 916 (Tenn.Ct.App.

1980), and should not be disturbed unless the record reveals a manifest abuse of such. *Cooper*, 689 S.W.2d at 872.

The defendants' contention would be correct if this were an unliquidated claim. *See Seay v. Shelby County*, 672 S.W.2d 404 (Tenn.Ct.App.1984); *Tyber v. Great Central Insurance Co.*, 572 F.2d 562 (6th Cir. Tenn.1978); *See* T.C.A. § 47–14–123. However, when as here, the claim is liquidated then the plaintiff is entitled to prejudgment interest as a matter of right. *See* T.C.A. § 47–14–109; *Performance Systems, Inc. v. First American National Bank*, 554 S.W.2d 616 (Tenn.1977). This right is a statutory right enumerated in T.C.A. § 47–14–109(b) which provides that "[l]iquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned." As the Tennessee Supreme Court stated in *Performance Systems, Inc. v. First American National Bank*,[1] this section by its own terms was intended to cover "any written instrument, signed by the debtor, whereby he promises to pay a person named a definite sum of money, for a valuable consideration stated, at a definite time, upon a specified condition...." 554 S.W.2d at 618. Therefore, a fixed obligation to pay installments of rent pursuant to a lease agreement comes within the import of the statute and entitles the plaintiff to receive prejudgment interest as a matter of right. *See Id.* The interest rate which is applicable is the legal rate set forth in T.C.A. § 47–14–103. *See State v. Campbell*, 721 S.W.2d 813 (Tenn.Cr.App. 1986). Accordingly, we remand to the trial court for a determination of such.

The judgment of trial court is reversed in part and affirmed in part and this cause is remanded for proceedings consistent with this opinion. Plaintiffs shall have judgment against the defendants for past due rents in the amount of $44,000 plus prejudgment interest thereon, for the mechanics lien in the amount of $500, for the increase in insurance premiums in the sum

of $3,580.63, and reasonable attorney's fees in the amount of $12,307.79, less any amount paid to the plaintiff by the trustee in bankruptcy of Jefferson's Nighttown, Inc. The remaining issues are pretermitted. Costs of this appeal are taxed to the appellees for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.

---

1. The language contained in T.C.A. § 47–14–109(b) was formerly enumerated in T.C.A. § 47–14–107 which the Tennessee Supreme Court specifically referred to in *Performance Systems, Inc. v. First American National Bank*, 554 S.W.2d 616 (Tenn.1977).