IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2017 Session

## BRIGGS & STRATTON POWER PRODUCTS GROUP, LLC v. OSRAM SYLVANIA, INC., ET AL.

### Appeal from the Circuit Court for Dyer County
No. 2011-CV-47      William B. Acree, Judge

_____

### No. W2016-01799-COA-R3-CV

_____

The tenant of a warehouse and the warehouse owner's property manager disagree over which party is responsible for the damage caused by a fire that destroyed the tenant's inventory. We have concluded that the "as is, where is" lease between the warehouse owner and the tenant places the responsibility for the damage on the tenant and that the trial court properly granted summary judgment in favor of the property manager.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Samuel Joseph Welborn, Joshua Kyle Chesser, and Jefferson Cooper Orr, Nashville, Tennessee, for the appellant, Briggs & Stratton Power Products Group, LLC.

Melissa Ann Maravich and Mary C. Hamm, Memphis, Tennessee, for the appellees, Quadrelle Realty Services, LLC and Quadrelle Group, Inc.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

The two main parties involved in this appeal are Briggs & Stratton Power Products Group, LLC ("Briggs"), a multi-national manufacturer of lawn mowers and other equipment, and Quadrelle Realty Services, LLC ("Quadrelle"). The case arises out of a warehouse fire in Dyersburg, Tennessee in December 2008.

On September 1, 2007, Briggs entered into a commercial lease with Bekaert Corporation ("Bekaert") for the lease of a portion of Bekaert's warehouse at One Bekaert

Road in Dyersburg. The term of the lease was from September 1, 2007, through December 31, 2008. The leased premises consisted of a portion of the 636,000-square-foot warehouse, with the leased footage increasing over the term of the lease.[1] Briggs used the warehouse to store inventory, including lawn mowers and snow blowers. The warehouse was partially lighted with metal halide bulbs (also called "lamps") manufactured by former defendants Osram Sylvania, Inc. and Osram Sylvania Products, Inc. (collectively, "Sylvania").[2]

For purposes of this appeal, the relevant provisions of the lease are the following:

> 3. <u>CONDITION OF LEASED PREMISES</u>. The Premises are being leased to Tenant in the present "AS-IS" "WHERE-IS" condition, with all faults whether known, unknown, patent or latent. Tenant has had the opportunity to inspect the Premises and accepts it in its present condition. Unless Tenant has caused the Leased Premises to be in violation of any code or ordinance, Tenant shall have no responsibility for bringing the Leased Premises into compliance with any code or ordinance and shall have no responsibility for payment of any fines assessed for any code or ordinance violation which Tenant has not caused. Notwithstanding the foregoing, Tenant shall have responsibility for any changes, alterations or repairs to the Premises (including repairs to bring the Premises into compliance with codes) that are necessitated by or necessary for Tenant's intended use of the Premises. Tenant acknowledges [and] agrees that the Premises is not, and will not be, heated and that sprinklers will not be operational unless Tenant agrees to provide[] heating (including servicing and/or repairing existing heaters and additional cost of natural gas that is not included in Base Rent). In the event it becomes necessary to erect a fence or other barrier between the Premises and rest of the Building for security or other reasons, the Landlord shall install the fence or barrier, but the cost of such shall be split equally between Landlord and Tenant.
> . . . .
> 6. <u>USE OF PREMISES</u>. Tenant shall use and occupy the Leased Premises for warehousing, distribution, product repairs, rework and related office use and for no other purpose without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. In no event shall the Premises [be] used in any way that constitutes a "hazardous occupation."

---

[1] Although the lease contemplated that Briggs would lease a total of 149,984 square feet, it appears from the record on appeal that, at the time of the fire, Briggs was leasing the entire east side of the warehouse, a total of about 296,000 square feet.

[2] Briggs and Sylvania subsequently settled the claims against Sylvania.

Tenant shall not use or occupy the Leased Premises or conduct its business in violation of any federal, state or local law or regulation, including all environmental laws and regulations, and shall discontinue any use of the Leased Premises which is declared by any governmental authority to be a violation of any such law or regulation. Tenant, at its sole cost and expense, shall comply with any directive of any governmental authority which shall impose any duty upon Tenant with respect to the Leased Premises or the use or occupation thereof, by reason of the nature of Tenant's use or occupancy of the Leased Premises. Tenant shall not commit, or suffer to be committed, any waste, nuisance or other act which may disturb the Leased Premises or any adjoining properties.
. . . .

8. REPAIRS. During the Term, Tenant shall, at Tenant's own expense, keep the Leased Premises clean and pest-free and in good order, repair and condition, normal wear and tear expected. Landlord shall be responsible for any repairs to the roof, foundation, exterior walls of the Leased Premises. Tenant shall promptly and adequately repair the Leased Premises and replace or repair all damages or broken fixtures or appurtenance, subject to the approval of Landlord. If Tenant does not do so, Landlord may, at its option, make such repairs and replacements, and Tenant shall pay Landlord the cost thereof. Landlord may, but shall not be required to, enter the Leased Premises at all reasonable times to make such repairs, alterations, improvements and additions to the Leased Premises or to any equipment located in the Leased Premises as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree. The HVAC systems serving the Premises are in their as-is condition, without warranty or other representation as to condition. Neither Landlord nor Tenant shall have any responsibility for repairs or replacements to the HVAC system. However, in the event the HVAC system is not appropriate for Tenant's intended use, Tenant shall have sole responsibility for repairs to the HVAC systems serving the Premises that are necessitated by or necessary for Tenant's intended use of the Premises.

9. ADDITIONS AND ALTERATIONS. Tenant shall not, without the prior written consent of Landlord which consent may be withheld in Landlord's sole and absolute discretion, make any alterations, improvements or additions to the Leased [sic]. If Landlord consents to said alterations, improvements or additions, it may impose such conditions with respect thereto as Landlord deems appropriate, including, without limitation, requiring Tenant to furnish Landlord with security for the payment of all costs to be incurred in connection with such work, insurance against liabilities which may arise out of such work and plans,

specifications and permits necessary for such work. The work necessary to make any alterations, improvements or additions to the Leased Premises shall be done at Tenant's expense and Tenant shall pay all contractors for such work. Tenant shall defend and hold Landlord harmless from all costs, damages, liens and expenses related to such work. All work done by Tenant or its contractors shall be done in a good and workmanlike manner using only good grades of materials and shall comply with all insurance requirements and all applicable laws and ordinances and rules and regulations of governmental departments or agencies.

. . . .

25. MISCELLANEOUS.

. . . .

The provisions of this Lease shall extend to and shall, as the case may require, bind and inure to the benefit not only of Landlord and Tenant, but also of their respective successors and assigns.

All of the representations and obligations of Landlord and Tenant are contained herein, and no modification, waiver or amendment of this Lease, or any of its conditions or provisions, shall be binding upon the Landlord or Tenant unless in writing, signed by the party to be charged or a duly authorized agent of the party to be charged.

The warehouse is a U-shaped building with two wings connected by an office. During the relevant time period, Briggs occupied the east wing of the warehouse, and the west wing of the warehouse was vacant.

In December 2007, Tower Dyersburg, LLC and DM Dyersburg, LLC ("Tower") purchased the entire warehouse property from Bekaert. In conjunction with the sale of the property, Bekaert and Tower entered into an Assignment and Assumption of Lease pursuant to which Bekaert assigned to Tower all of its rights, title, and interest in, as well as its liabilities and obligations under, the 2007 lease between Bekaert and Briggs. Briggs also signed a Tenant Estoppel Certificate dated January 29, 2008, in which it acknowledged that the 2007 lease was in full force and effect; that it did not have any defense, credit offset, claim or counter-claim against Bekaert; that neither party was in default of its obligations under the lease; and that "tenant has no knowledge of any material defects in the Premises or the Property or any related improvements."

On January 2, 2008, Tower entered into a Management Agreement with Quadrelle for the latter to provide management services for the entire One Bekaert Road property. The agreement provided that Quadrelle was to manage and operate the property in accordance with the management agreement and with the 2007 lease. The duties of the manager, as detailed in the management agreement, were primarily financial in nature:

(a)     To use its best efforts on behalf of the Owner to maintain high occupancy so that the Property may be operated profitably and to assist Owner's leasing agent in obtaining new tenants.  Provided, however, if there is no leasing agent with respect to the Property, in the absence of such outside broker, Manager shall endeavor to lease such vacant space which now, or in the future, may become available, consistent with the terms of the attached Leasing Agreement.  From time to time Manager will propose advertising plans to Owner for Owner's approval.

(b)     To use its best efforts to collect all rents (including percentage rent, escalation billings and billings attributable to tenant participation in operating expenses, taxes and common area maintenance charges) and other sums due Owner from any tenant, subtenant or others in the ordinary course of business, to employ such lawyers and accountants and other professional persons as may be necessary, subject to Owner's direction and approval, and to proceed in the name of the Owner against any person, firm or corporation indebted to the Owner for rentals or otherwise.

(c)     To maintain a separate bank account . . . in which all receipts from the Property will be deposited and from which all payments with respect to the Property will be made.  Manager shall pay all leases and mortgage payments required and other authorized items of costs or expenses to the extent funds are available and Manager shall promptly notify Owner if additional funds are required.  From time to time at the discretion of Owner, if funds are available, Manager shall distribute amounts to Owner or its partners.

(d)     To pay all taxes and insurance premiums when due to the extent that funds are available and to promptly notify Owner if additional funds are required.

(e)     To *maintain the Property in a neat and first-class manner* at the expense of the owner.  For any item of repair or replacement costing in excess of Ten Thousand Dollars ($10,000) (except for emergencies, in which case Manager may make repairs in excess of the aforementioned amount), such expenditures must be specifically authorized in advance by Owner.

(f)     To employ such professional services, including lawyers, accountants, surveyors and engineers, on behalf of Owner as may be required in the ordinary course of the business of operating the Property subject to approval of Owner.

(g)     To prepare an annual budget of operating and capital expense to be incurred in the promotion, operation, repair and maintenance of the Property and to deliver the same to Owner for its approval at least thirty (30) days prior to December 31 each year. . . .

(h)     Manager is authorized in the name of and at the expense of Owner to make contracts for electricity, gas, steam, telephone, window cleaning,

vermin extermination, and other services, or such of them as Agent shall deem advisable, provided that any such contracts (except for utilities) shall be terminable within thirty (30) days. . . .

(i)  Manager shall pay interest or amortization on mortgages, taxes, assessments, water charges, premiums on insurance, unless Owner in writing expressly directs Manager not to do so.

(Emphasis added).

On April 1, 2008, Quadrelle entered into a written contract with Mike Montgomery, an independent contractor, to provide on-site property management services for the One Bekaert Road facility.  Mr. Montgomery's responsibilities included building security, landscaping, responding to alarms on a 24-hour basis, initiating first response to building problems and contacting contractors, monitoring tenant activity, and reporting at least weekly to the management agent regarding "overall property operation further defined as property maintenance, tenant issues, tenant installation, tenant improvements, capital improvements and any other pertinent property issues *requiring Owner (Landlord) attention*."

Tower and Briggs agreed, in July 2008, upon the terms of a new lease for the period beginning on the earlier of January 1, 2009, or the date when the premises were ready for occupancy as defined in the lease.  The 2008 lease provided for improvements to the leased premises at Tower's cost.  These improvements included a "recessed truck well for seven new dock doors," a trailer drop lot, and the replacement of a maximum of seventy light bulbs in light fixtures in the leased premises.  In addition, Tower was having a sprinkler system installed on the leased premises during the fall of 2008.  When Briggs initially took possession of the leased premises from Bekaert in September 2007, it knew that the portion of the leased premises at issue did not have a working sprinkler system.

On December 1, 2008, fire consumed the portion of the warehouse occupied by Briggs and destroyed substantially all of its stored inventory.  (At the time of the fire, the installation of the new sprinkler system was not complete.)   Briggs alleges that metal halide lamp L120 manufactured by Sylvania exploded and caused the fire, a fact not disputed by Quadrelle for purposes of arguing its summary judgment motion.

The Lawsuit

This case began in May 2011 with a complaint filed by Briggs[3] against Sylvania. Briggs asserted causes of action for negligence, strict liability, breach of implied warranty

---

[3] The real party in interest was and is Briggs's insurer, Factory Mutual Insurance Company.

of merchantability, breach of implied warranty of fitness for a particular purpose, gross negligence, and willful or wanton misconduct. Briggs alleged that Sylvania developed, designed and manufactured the metal halide lamp, which exploded due to a defect in design, material, manufacturing and/or workmanship. In an amended complaint filed in August 2011, Briggs asserted a cause of action for negligence against Tower and Quadrelle based on "a duty to inspect, maintain, operate, and keep the Warehouse and the component parts thereof in a reasonably safe manner."

Tower and Quadrelle filed a motion for summary judgment in April 2012 arguing that a waiver of subrogation clause[4] in the 2007 lease barred the suit against them. In an order entered in June 2013, the trial court determined that the waiver of subrogation clause "precludes Briggs from maintaining a claim against Tower for the amount paid by Briggs' insurance carrier which is in the amount of $24,565,247.00." Briggs could, the court stated, "maintain the claim for the amount of its insurance deductible which is $250,000.00." The trial court rejected Quadrelle's argument that the waiver of subrogation clause covered agents of the owner. Based on this analysis, the trial court granted partial summary judgment to Tower and denied Quadrelle's motion for summary judgment.

Tower and Quadrelle filed a second motion for summary judgment in June 2014 seeking dismissal of all claims against them under the "as is, where is" clause of the 2007 lease. On December 10, 2014, the trial court denied the second motion for summary judgment as moot because the court granted Briggs's request to file a second amended complaint. In its second amended complaint, Briggs added specificity to its negligence allegations against Tower and Quadrelle and asserted new causes of action against them for negligence per se, gross negligence, and fraud/misrepresentation and intentional misconduct. With respect to Tower only, Briggs alleged breach of contract and breach of the express covenant of quiet enjoyment.

On January 16, 2015, Tower and Quadrelle filed their third motion for summary judgment, relying on the "as is, where is" clause of the 2007 lease to argue that Briggs, not Tower and Quadrelle, had the duty to repair and maintain Briggs's portion of the leased premises and that the defendants were entitled to dismissal of the negligence and

---

[4] The waiver of subrogation clause, which is not at issue on appeal, provides, in pertinent part, as follows:

> Any policies purchased by Tenant shall contain a clause pursuant to which the insurance carrier waives all rights of subrogation against Landlord with respect to losses payable under such policies. Landlord (for itself and its insurer) hereby waives any rights, including rights of subrogation, and Tenant (for itself and its insurer) hereby waives any rights, including rights of subrogation, each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, to their respective property, the Premises or its contents that are caused by or result from risks insured against under any insurance policies carried by the parties hereto and in force at the time of any such damage.

gross negligence claims. The defendants further argued that they did not breach any provision of the 2007 lease; that Briggs's negligence per se claim failed for lack of causation; and that its fraudulent concealment claim failed for lack of reasonable reliance and the absence of a fiduciary relationship.

On April 27, 2015, the trial court entered an order denying the defendants' third motion for summary judgment.[5] The court found that the "[p]arties dispute the facts related to how the lamps at issue were installed and who were the responsible persons who installed these lamps." The court further stated:

> Under *Hannan* [*v. Alltel Publishing Co.*], 270 S.W.3d 1, 5 (Tenn. 2008), defendant must affirmatively negate an essential element of the plaintiff's case or provide an affirmative defense in order to shift the burden to the plaintiff at the Summary Judgment hearing. In this case, Defendants have not affirmatively negated Plaintiff's claims. At this time, there remains material disputed facts which must be considered by the finder of fact at trial. Plaintiff has the opportunity to put on proof of actions of the Defendants after the time of execution of the lease in order to prove their claims. As such, this court DENIES Defendants' motion.

Quadrelle filed a motion to alter or amend or, in the alternative, for permission to file an application for interlocutory appeal regarding the court's order denying Quadrelle's third motion for summary judgment. On July 6, 2015, the trial court entered an order granting Quadrelle's motion to amend "in order to provide clarification of the law and facts on which it relied" in granting summary judgment. The court then went through each of the claims alleged by Briggs and concluded that Quadrelle had failed to shift the burden of proof to Briggs. The trial court denied Quadrelle's request for an interlocutory appeal.[6] Quadrelle filed an application for an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, which this Court denied on October 12, 2015. Quadrelle then filed a Rule 10 application in the Tennessee Supreme Court.

On October 26, 2015, the Tennessee Supreme Court filed its opinion in *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015), overruling *Hannan* and adopting a new summary judgment standard.

---

[5] In this same order, the trial court denied Briggs's motion to alter, amend, or set aside the court's June 11, 2013 order granting partial summary judgment to Tower on the basis of the waiver of subrogation clause.

[6] On September 1, 2015, Briggs and Tower entered into a consent order of dismissal after settling the only remaining claim between them, the $250,000.00 deductible from Briggs's Factory Mutual insurance policy.

On November 5, 2015, Quadrelle filed a motion to alter or amend or, in the alternative, fourth motion for summary judgment arguing that, under the *Rye* standard, Briggs had failed to submit sufficient evidence to establish the essential elements of its claims against Quadrelle.

On November 25, 2015, the Supreme Court entered an order denying Quadrelle's Rule 10 application, "without prejudice to Quadrelle's filing of a new motion for summary judgment in the trial court in light of this Court's decision in *Rye v. Women's Care Center of Memphis, MPLLC*, [477 S.W.3d 235 (Tenn. 2015)]."

On May 9, 2016, the trial court entered an order granting Quadrelle's fourth motion for summary judgment and dismissing all claims brought by Briggs against Quadrelle. The court gave the following summary of its ruling:

> The Court does not find the language of the Lease to be ambiguous and Quadrelle owed no duty to Briggs & Stratton under the terms of the Lease. Quadrelle breached no duty to Briggs & Stratton to comply with the Dyersburg fire safety and building codes and there is no causal connection between a noncompliance and the fire. Quadrelle did not assume the duty to inspect and/or replace Lamp L120. Quadrelle made no false representation to Briggs & Stratton. The Court finds no issues of material facts exist and Quadrelle negated an essential element of each claim made by Briggs & Stratton at the summary judgment stage thereby satisfying the *Rye* standard. Quadrelle's Fourth Motion for Summary Judgment is GRANTED.

Determining that there was "no just reason for delay," the court directed that this order be a final judgment pursuant to Tenn. R. Civ. P. 54.02 as to Quadrelle.

Briggs filed a motion to alter or amend, which was denied by the trial court in an order entered on July 25, 2016. The court incorporated into its order the oral findings of fact and conclusions of law made at the conclusion of oral arguments on July 14, 2016. We will discuss the court's findings in this order and the previous order as relevant to our analysis of the issues on appeal. Briggs appeals from the May 9, 2016 final judgment.

### Issues on Appeal

On appeal, Briggs raises the following issues: (1) Whether the trial court erred in granting summary judgment to Quadrelle when Quadrelle admitted that many material facts were in dispute; (2) whether the trial court erred in ruling that Quadrelle's noncompliance with city codes did not amount to negligence per se; (3) whether Quadrelle's breaches caused the fire to spread more than it would have had Quadrelle satisfied its duties; (4) whether Briggs's knowledge or conduct relieved Quadrelle of its

non-delegable, non-waivable duties under the applicable codes; (5) whether Quadrelle assumed a duty to Briggs when it changed light bulbs in the warehouse and Briggs relied upon Quadrelle to continue to change light bulbs in the warehouse; (6) whether Quadrelle made a false representation to Briggs when it intentionally concealed material facts that it had a legal duty to disclose to Briggs where Briggs was unaware of the suppressed information and sustained damages as a result of Quadrelle's concealment of the material facts; and (7) whether the trial court erred in concluding that it was undisputed that a metal halide lamp exploded and caused the fire.

STANDARD OF REVIEW

Whether a party is entitled to summary judgment is a matter of law, which means that we review the trial court's judgment de novo, according the trial court's decision no presumption of correctness. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. As the Supreme Court explained in *Rye v. Women's Health Care Center*:

> Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." TENN. R. CIV. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue

- 10 -

for trial." TENN. R. CIV. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 264-65.[7]

In determining whether a party is entitled to summary judgment, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Martin*, 271 S.W.3d at 84 (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

ANALYSIS

In appealing the trial court's judgment granting summary judgment in favor of Quadrelle, Briggs makes numerous arguments. We begin, however, by addressing the proper framework in which to view this case—a commercial lease between two sophisticated parties (Briggs and Tower) coupled with a management agreement between two sophisticated parties (Tower and Quadrelle).

I. "As Is, Where Is" Contract

Quadrelle's duties to Briggs are governed by its management agreement with Tower, which incorporates the 2007 "as is, where is" lease between Tower and Briggs. Tennessee courts have enforced "as is, where is" commercial leases:

---

[7] *See also* Tenn. Code Ann. § 20-16-101, which provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Essentially an "as-is" clause means that the buyer or lessee is purchasing or leasing the goods or property as it is in its present state or condition. This generally implies that the property is taken with whatever faults it may possess and implies that the seller or lessor is released of any obligation to reimburse the purchaser or lessee for losses or damages that result from the condition of the goods or property.

*Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991); *see also C.F. Prop., LLC v. Scott*, No. E2010-01981-COA-R3-CV, 2011 WL 4446995, at \*5-6 (Tenn. Ct. App. Sept. 27, 2011) (holding that, despite landlord's statements that he would "talk about" repairing the roof, landlord had no obligation to repair leaky roof under "as is, where is" lease where tenants were aware that roof leaked when they entered into the lease); *Chandler v. Johnson*, No. 01-A-01-9603-CV00124, 1996 WL 491827, at \*4 (Tenn. Ct. App. Aug. 30, 1996) (stating that "a landlord may, by stipulation in a commercial lease agreement, exempt himself from liability for any damage caused by defects in the leased premises").

When examining an agreement such as a lease, "our primary task is to ascertain the intention of the parties." *Piana v. Old Town of Jackson*, 316 S.W.3d 622, 628 (Tenn. Ct. App. 2009); *see also Jaffe*, 817 S.W.2d at 25. We "consider the words of the instrument in the context of the instrument as a whole and give those words their usual, natural, and ordinary meaning." *Piana*, 316 S.W.3d at 628. The courts may also consider the subject matter of the contract, the circumstances surrounding the transaction, and the parties' construction of the contract in carrying it out. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990). If a contract contains ambiguous language, a court may use parol evidence to guide it in construing the contract. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006).

Under the 2007 lease, was the landlord (Tower) or the tenant (Briggs) responsible for repair and maintenance of the leased premises, including the metal halide lamps? Sections three and eight of the lease state, in pertinent part:

3. <u>CONDITION OF LEASED PREMISES</u>. The Premises are being leased to Tenant in the present "AS-IS" "WHERE-IS" condition, with all faults whether known, unknown, patent or latent. Tenant has had the opportunity to inspect the Premises and accepts it in its present condition. Unless Tenant has caused the Leased Premises to be in violation of any code or ordinance, Tenant shall have no responsibility for bringing the Leased Premises into compliance with any code or ordinance and shall have no responsibility for payment of any fines assessed for any code or ordinance violation which Tenant has not caused. *Notwithstanding the foregoing, Tenant shall have responsibility for any changes, alterations or repairs to the Premises (including repairs to bring the Premises into compliance with codes) that are necessitated by or necessary for Tenant's intended use of*

- 12 -

*the Premises.* Tenant acknowledges [and] agrees that the Premises is not, and will not be, heated and that sprinklers will not be operational unless Tenant agrees to provide[] heating (including servicing and/or repairing existing heaters and additional cost of natural gas that is not included in Base Rent).

8. <u>REPAIRS</u>. During the Term, Tenant shall, at Tenant's own expense, keep the Leased Premises clean and pest-free and in good order, repair and condition, normal wear and tear expected. *Landlord shall be responsible for any repairs to the roof, foundation, exterior walls of the Leased Premises. Tenant shall promptly and adequately repair the Leased Premises and replace or repair all damages or broken fixtures or appurtenance, subject to the approval of Landlord.* If Tenant does not do so, Landlord may, at its option, make such repairs and replacements, and Tenant shall pay Landlord the cost thereof. Landlord may, but shall not be required to, enter the Leased Premises at all reasonable times to make such repairs, alterations, improvements and additions to the Leased Premises or to any equipment located in the Leased Premises as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree.

(Emphasis added). By its unambiguous terms, the "as is, where is" lease placed the responsibility on Briggs as the tenant to repair and maintain the leased premises. Under its management agreement with Tower, paragraph (e) obligated Quadrelle "to maintain the Property." Consistent with the 2007 lease, the property to be maintained by Quadrelle would be the common property, not the leased premises.

We agree with the trial court's conclusions:

The Court does not find the language of the Lease to be ambiguous and cannot find any provision of the Lease that charges the Landlord or its agents with the responsibility of inspecting and/or replacing light bulbs on the premises. The Court finds no issues of material facts exist and Quadrelle owed no duty to Briggs & Stratton under the terms of the Lease. Therefore, the duty element of Briggs & Stratton's claims in Negligence and Gross Negligence is negated and summary judgment for Quadrelle is proper as to these claims.

Having found no duty owed by Quadrelle to Briggs under the terms of the lease with regard to repair or maintenance of the light bulbs, we conclude that the trial court properly granted summary judgment to Quadrelle with respect to Briggs's claims for negligence and gross negligence. (We will address Briggs's claims with respect to code violations below.)

- 13 -

II. Existence of disputed material facts

On January 29, 2016, in response to Quadrelle's fourth motion for summary judgment, Briggs filed a "Rule 56.03 Statement of Additional Facts." As to thirty-two of these statements, Quadrelle's response was "disputed" or "disputed factual statement." In response to fourteen other statements, Quadrelle stated merely: "no response." Briggs makes the argument that "[a] summary judgment movant who admits that 32 material statements of fact are disputed and refuses to respond to 14 other material statements of fact cannot be awarded summary judgment." We do not agree with Briggs's argument.

With respect to the fourteen statements to which Quadrelle stated "no response," Briggs asserts that "such response should be interpreted as a conceded factual dispute." We disagree with this conclusion. The statements to which Quadrelle replied "no response" include basic facts concerning the 2007 lease transaction and the December 2007 sale of the property to Tower. Quadrelle's "no response" indicates that it had no dispute concerning the statements at issue.

As Briggs points out, summary judgment is proper only if there are no material facts in dispute. *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 82 (Tenn. 2010). While Briggs makes clear in its brief that it considers all of the facts in its Statement of Additional Facts to be material, Briggs does not explain how any of the individual statements of disputed fact is material to any specific claim for relief. Moreover, contrary to Briggs's assertion, Quadrelle has not admitted that these facts are material. For purposes of summary judgment, Quadrelle established that there are no material facts in dispute.

III. Code Violations

Briggs further argues that summary judgment was not proper because Quadrelle breached a duty to Briggs to comply with the Dyersburg fire safety and building code requirements. Briggs asserts that this duty is non-delegable[8] and that its breach constitutes negligence per se. We disagree.

Under the terms of the lease, the parties contemplated that Briggs took the leased premises in its "as is, where is" condition, which included code violations:

Tenant has had the opportunity to inspect the Premises and accepts it in its present condition. Unless Tenant has caused the Leased Premises to be in violation of any code or ordinance, Tenant shall have no responsibility for

---

[8] None of the cases from other jurisdictions cited by Briggs to support its non-delegability argument involved a dispute between two parties to a commercial lease. We do not find these authorities relevant to the present case.

bringing the Leased Premises into compliance with any code or ordinance and shall have no responsibility for payment of any fines assessed for any code or ordinance violations which Tenant has not caused. Notwithstanding the foregoing, Tenant shall have responsibility for any changes, alterations or repairs to the Premises (including repairs to bring the Premises into compliance with codes) that are necessitated by or necessary for Tenant's intended use of the Premises. Tenant acknowledges [and] agrees that the Premises is not, and will not be, heated and that sprinklers will not be operational unless Tenant agrees to provide[] heating.

As the court stated in *Jaffe v. Bolton*, 817 S.W.2d at 25, when property is leased "as is," both parties are charged with the knowledge of any code violations that existed when they entered into the lease. We agree with the trial court: "The duty element of Briggs & Stratton's claim in Negligence *per se* is negated and summary judgment for Quadrelle is proper as to this claim."

Having concluded that Quadrelle owed no duty of code compliance to Briggs, we need not address its argument that Quadrelle's failure to satisfy these duties caused "significant fire spread."

IV. Assumption of Duties

Briggs further asserts that Quadrelle assumed duties that Briggs relied upon Quadrelle to perform, and that Quadrelle's failure to perform those duties caused the fire. More specifically, Briggs argues that Quadrelle assumed duties when it performed light fixture maintenance; replaced metal halide lamps; and investigated the leased premises for code compliance. As to the third item in the list, investigation for code compliance, Briggs offers no further explanation. We have discussed the topic of code compliance above and determined that, under the terms of the lease, Briggs took the leased premises with any known, patent, or latent code violations. We, therefore, find no basis for Briggs's arguments that Quadrelle assumed duties for code compliance. We will focus our analysis on the other two items in Briggs's list.

There are disputed facts as to what services Quadrelle or third parties acting at Quadrelle's behest performed in Briggs's part of the warehouse. For purposes of summary judgment, however, it is undisputed that Quadrelle or its agent removed and capped a light fixture that started a previous fire; changed twelve (12) metal halide light bulbs somewhere on the One Bekaert Road premises; conducted maintenance on an HVAC unit; and conducted plumbing and miscellaneous building maintenance. Briggs has not alleged that any of these actions was performed negligently. Briggs asserts that, by performing these acts, Quadrelle assumed "responsibility for certain activities within and affecting the Warehouse," and that Quadrelle "owed a duty to Briggs to exercise reasonable care in performing these undertakings." Although Briggs does not spell out

- 15 -

the exact duties Quadrelle owed it, Briggs does state that the duties included "metal halide lamp replacement within the Leased Premises, or lighting fixture maintenance within the Leased Premises."

The 2007 lease specifically states, at paragraph 25:

All of the representations and obligations of Landlord and Tenant are contained herein, and no modification, waiver or amendment of this Lease, or any of its conditions or provisions, shall be binding upon the Landlord or Tenant unless in writing, signed by the party to be charged or a duly authorized agent of the party to be charged.

Thus, under the express terms of the lease between Briggs and Tower, the lease cannot be modified except in writing signed by the party to be charged. The lease was never modified by Briggs or Tower; and neither Montgomery nor Quadrelle had the authority to modify the contract without the express permission of Tower. Similarly, neither Montgomery nor Quadrelle had the authority to assume a duty to Briggs in contravention of the terms of the lease. Such an attempt to undertake a duty not contemplated by the lease would also likely fail for lack of consideration.[9] *See Hertz Corp. v. Memphis Dinettes, Inc.*, 1987 WL 6270, at \*2 (Tenn. Ct. App. Feb. 9, 1987) ("Modification of a contract must be supported by consideration.").

## V. Fraud/Misrepresentation

Briggs's argument here is that the trial court erred by focusing on active representation rather than representation by concealment. To establish fraudulent concealment, a plaintiff must show the following: "(1) the defendant had a duty to disclose a known fact or condition; (2) the defendant failed to disclose it; (3) the plaintiff reasonably relied upon the resulting misrepresentation; and (4) the plaintiff consequently suffered injury." *Wright v. Wacker-Chemie AG*, No. 1:13-LC-331, 2014 WL 3810584, at \*10 (E.D. Tenn. Aug. 1, 2014) (citing *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538-39 (Tenn. 1998)). Briggs failed to create a genuine issue of material fact as to the elements of duty and reasonable reliance.

When does someone have a duty to disclose? "'The duty to disclose arises when (1) there is a fiduciary relationship between the parties; (2) one of the parties has expressly reposed trust and confidence in the other; or (3) the contract is intrinsically fiduciary and calls for perfect good faith.'" *Gurley v. Hickory Withe Partners, L.P.*, No. W2002-02050-COA-R3-CV, 2003 WL 22204520, at \*4 (Tenn. Ct. App. Sept. 10, 2003)

---

[9] It should also be noted that there is no evidence in the record that L120, the metal halide lamp that allegedly caused the fire, was past its rated life or needed to be replaced. Therefore, there is no proof of a causal link between any alleged maintenance failure of Quadrelle and the fire.

(quoting *Cont'l Land Co., Inc. v. Inv. Props. Co.*, No. M1998-00431-COA-R3-CV, 1999 WL 1129025, at \*6 (Tenn. Ct. App. Dec. 10, 1999)). The relationship between Briggs and Quadrelle was not a fiduciary relationship[10] or a relationship characterized by one party placing trust and confidence in the other. Under the "as is, where is" lease, the parties were dealing with each other in an arm's length commercial transaction. *See Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673 (Tenn. 2013) (Koch., J., concurring) ("[A]bsent extraordinary circumstances, parties dealing at arm's length in a commercial transaction lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship.").

Without a duty to disclose, there can be no fraudulent concealment. Furthermore, Briggs did not put forward evidence to establish a dispute of material fact regarding reasonable reliance. In *C.F. Property,* 2011 WL 4446995, at \*1, the trial court found that "the landlord misrepresented that the roof was repairable when the landlord knew it could not be repaired." The parties were operating under an "as is, where is" lease. *C.F. Prop.*, 2011 WL 4446995, at \*1. In reversing the trial court's judgment, the appellate court reasoned as follows:

> The Tenants simply knew too much to bury their head in the sand and assume that the Landlord would abandon all the disclaimers in the lease and decide at the end of one year to repair or replace the roof. The Tenants knew the roof leaked. They knew the leaks were so bad that the Tenants demanded a concession on the purchase price in the event they exercised a proposed option to purchase. . . . The Tenants admitted that they did not inspect the roof prior to executing the lease or hire any professional to inspect it.
>
> With all their knowledge, especially in light of the clear disclaimers in the lease, it was not reasonable for the Tenants to simply close their eyes to the known facts and rely on one statement that the Landlord would "talk about . . . it" to conclude that (1) the roof need not be replaced but could be repaired and (2) the Landlord would repair it. This Court has held that "[a]n essential [element] of any action for fraud, deceit, failure to disclose or negligent or innocent misrepresentations is detrimental reliance on a false premise." *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005) (quoting *Williams v. Berube & Associates*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). The reliance must be justifiable, or reasonable. *Id.*

---

[10] A fiduciary relationship "'arises when one person reposes special trust and confidence in another person'" (the fiduciary), and the fiduciary "'undertakes to assume responsibility for the affairs of the other party.'" *Morrison v. Allen*, 338 S.W.3d 417, 437 (Tenn. 2011) (quoting *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 641-42 (Tenn. 2008) (Koch, J., concurring)).

- 17 -

*Id.* at *6-7.  In this case, Briggs cannot show that it justifiably relied on Quadrelle to inform it of the alleged problems (code violations, lack of sprinkler system, a faulty light bulb) in light of the "as is, where is" lease under which it agreed to accept the premises "with all faults whether known, unknown, patent or latent" and after having the opportunity to inspect the leased premises.[11]

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Briggs & Stratton.  Execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[11] We reject Briggs's argument that the trial court erred in considering as an undisputed fact that the explosion of a defective metal halide lamp caused the fire.  For purposes of its motion for summary judgment, Quadrelle did not dispute this fact.